UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
Mary Nell Wyatt, et al                          :
                                                :
                    Plaintiffs                  :
                                                :          08 cv 502 (RMU)
            v.                                  :
                                                :
The Syrian Arab Republic and
The Kurdistan Workers  Party

                                                :
                    Defendants.                 :
_____:


**THE SYRIAN ARAB REPUBLIC'S  MEMORANDUM  OF  POINTS
AND AUTHORITIES IN SUPPORT OF SYRIA'S  RULE 12(b) MOTION
TO DISMISS THE COMPLAINT**


Ramsey Clark DC Bar No. 73833
Lawrence W. Schilling
37 West 12th Street, 2B
New York, NY 10011
212-989-6613
212-979-1583 fax
lwschilling@earthlink.net
Attorneys for the Syrian Arab Republic

**Preliminary Statement**

This motion and supporting memorandum address the complaint dated March 20, 2008

and  filed by plaintiffs on March 24, 2008.  The complaint makes no mention of the prior

complaints filed by the Wyatt plaintiffs or prior proceedings in case 01cv1628(RMU) and no

mention of §1083 of the National Defense Appropriations Act of 2008   (NDAA).  On its face the

complaint is time-barred under §1605A(b), since the complaint was filed "later than the latter of"

10 years after April 24, 1996 and 10 years after plaintiffs alleged cause of action arose in August

1991.

Plaintiffs will probably claim that provisions of §1083 render the complaint filed on March

24, 2008, timely.  Defendant cannot address a position plaintiffs have not yet taken.  Indeed

plaintiffs may well file a first amended complaint which may well moot Syria's present Rule 12(b)

motion.   .

**Argument**

**Introduction**

.           The legal arguments that follow intend, as one principal purpose to

an analysis of how the state sponsor of terrorism exception has led the U.S. toward repudiation of

the first principle of the U.N. Charter and essential basis for law among nations, the sovereign

equality of every nation and lead the judiciary into a highly politicized field of litigation as an

instrument of U.S. foreign policy that changes with the season, endangering the finality of federal

court judgments and the independence of Article III courts.

**I.     Article 2 The United Nations Charter Requires All Members**

**To Act In Accordance With the Principle of Sovereign Equality**
**On Which The U.N. Is Based And to Fulfill In Good Faith Their**
**Obligation To Ensure The Sovereign Equality Of Each Member**

**A.      FSIA §1605(a)(7) and §1605A, its Successor Being Invoked by Plaintiffs Here,**
**Violate the Sovereign Equality and the Juridical Equality of the Syrian Arab**
**Republic and the Obligation of the United States, in common with the U.N. and**
**Each of its Members, to Ensure the Sovereign Equality of all U.N. Members by Seeking to**
**Subject the Syrian Arab Republic to the Coercive Power of U.S. Courts for Alleged Acts of**
**State in Violation of FSIA §1605(a)(7) and §1605A, While Recognizing the Sovereign**
**Immunity of all but Several Other U.N. Members from Suits for Violations of  §1605(a)(7)**
**and §1605A**

Chapter I of the U.N. Charter, entitled "Purposes and Principles", contains only two articles.

Article 1 declares "The purposes of the U.N. are:

"1.  To maintain international peace and security...
"2   To develop friendly relations among nations...
"3   To achieve international co-operation...
"4   To be a center for harmonizing the actions of nations..."

Article 2 declares the Principles of the U.N.  It begins

"The Organization and its Members, in Pursuit of the Purposes stated in Article 1, shall act in accordance with the following Principles.

"1.  The Organization is based on the principle of the sovereign equality of all its
       Members.
"2.   All Members, in order to ensure to all of them the rights and benefits resulting from
        membership, shall fulfill in good faith the obligations assumed by them in
        accordance with the present Charter."

Sovereign equality has always been understood to be the essential foundation of all hope

for a law of nations.

"Long before the drafting of the U.N. Charter, its first principle – the sovereign equality of

all nations – was an axiom of international law."   Benedict Kingsbury, Sovereignty and

Inequality, 9 European J. Int'l Law 599, 603 (1998).

2

The attempted exercise of judicial power by one sovereign over the body politic, ministries, agencies, or officials of another sovereign for governmental acts within its own territory, or elsewhere outside the territory of the sovereign seeking to coerce it by the exercise of judicial power, is a direct assault upon the sovereignty of that government and where exercised selectively violates the principles of sovereign equality and juridical equality protected by the U.N. Charter, U.N. declarations, other multinational and bilateral treaties and by customary international law.

The threat or use of judicial power to compel conduct, such as the compulsion of testimony from government officials or personnel, or the surrender or seizure of official papers, or property of a foreign sovereign nation based on acts of that foreign sovereign within its own country, or elsewhere outside the territory of the sovereign seeking to employ such force is a provocative violation of its sovereignty.

For more than two centuries, until the 1996 amendments to the FSIA, U.S.courts recognized the sovereign equality of nations and refused to exercise jurisdiction over foreign states for violence and other tortious acts where death or injury resulted outside the U.S. or international waters. See, § 454(a) Restatement of the Law (Third), the Foreign Relations Law of the United States (ALI). A painful and humiliating example involved the U.S. Embassy personnel forcibly held in Tehran in the history changing hostage crisis of 1979-81. U.S. Embassy personnel were denied relief on claims for damages against Iran brought in U.S. courts because Iran had sovereign immunity. See Persinger v. Islamic Republic of Iran, 729 2d 835 (D.C. Cir. 1984), cert denied 469 U.S. 881 (1984). After enactment of the 1996 terrorism exception, FSIA §1605(a)(7), the U.S. Embassy hostages tried again to recover for their injuries only to fail

3

because of the 1980 Algiers Accords, a bilateral treaty between the U.S. and Iran by which their

release was secured which prohibited such an action.  See <u>Roeder</u> v. <u>Islamic Republic of Iran</u>, 333

F.3d 228 (D.C. Cir. 2003)

      The legislative denial of sovereign immunity to a few selected nations is a hostile political

act and can be extremely costly and provocative.  For a sovereign, or its officials to be hailed into

a foreign court for alleged governmental acts on their nation's own soil, or elsewhere outside the

territory of the demanding government, is to be asked to submit to the supremacy of another

sovereign for acts in other parts of the world on the soil of other sovereigns and if complied with,

potentially forced to provide testimony by high officials, surrender and expose state secrets and

confidential information and forfeit hundreds of millions even billions of dollars however

impoverished its own citizens may be.

      The enormous judgments entered by U.S. courts in cases against selected sovereign

nations including impoverished peoples are beyond imagination elsewhere in the world, and

further inflame anti American passions.  They invite retaliation and response in kind and of various

kinds.  The Department of State itself, whose employees were held hostage in Tehran, has often

vigorously opposed such selective violations of sovereign immunity as contrary to law and

important foreign policy interests of the U.S.  The unprecedented addition of punitive damages

against foreign sovereigns creating a right in U.S. citizens to punish foreign sovereigns through

U.S. courts, compounds the assault on equal sovereignty.  See FSIA §1605A(c), enacted January

28, 2008.

      The equal sovereignty of every nation is the necessary and rightful foundation of the law

of nations.  No other standard can achieve the acceptance of all nations to the mandate of

international law.

The Preamble of the Universal Declaration of Human Rights begins "Whereas recognition of the inherent dignity and the equal and unalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world."  Article 1 of the Declaration declares "All human beings are born free and equal in dignity and rights."

Article 2(1) of the International Covenant on Civil and Political Rights, to which the United States is a Party proclaims

> "Each State Party to the present Covenant undertakes to respect and to insure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, color, sex, language, religion, political or other opinion, national or social origin, property, birth, or other status."

The principles of the U.N. Charter, like those of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights are woven into the fabric of international law, including treaties, agreements, the charters and acts of international organizations and customary international law.

The Charter of the Organization of American States, which the United States has ratified and in which it remains a Member, proclaims itself "a regional agency", "Within the United Nations".  Article 1.  In Article 3, it provides "The American States reaffirm the following principles:

(a) International law is the standard of conduct of States in their reciprocal relations;

(b) International order consists essentially of respect for the personality, sovereignty, and independence of States, and the faithful fulfillment of obligations derived from treaties and other sources of international law..."

5

The Convention on Rights and Duties of States, the "Montevideo Convention" which entered into force for the U.S. on December 26, 1934 provides in Article 4: "States are juridically equal, enjoy the same rights and have equal capacity in their exercise.   The rights of each one do not depend on the power which it possesses ... but upon the simple fact of its existence as a person under international law."   More than a decade before the U.N. Charter was drafted, the United States agreed that all states possess equal sovereign rights, equality in the exercise of those rights, equal juridical power and status and equality under the law and in the Courts of other states.

The Declaration of Principles of International Law concerning Friendly Relations and Cooperation Among States in Accordance with the Charter of the United Nations.  October 24, 1970. UNGA Res 2625 (XX_) 25 U.N. GAOR, Supp (No. 28) 121, U.N. Doc. A18028(1971);

"1. Solemnly proclaims the following principles...

"The principle of sovereign equality of States,

"All States enjoy sovereign equality.  They have equal rights and duties and are equal members of the international community, notwithstanding differences of an economic, social, political, or other nature.

"In particular, sovereign equality includes the following elements:
"(a) States are juridically equal;
"(b) Each State enjoys the rights inherent in full sovereignty;
"(c) Each State has the duty to respect the personality of other States."

The Supreme Court of Canada addressed the issue of sovereign equality and related principles in a  case  involving material seized in a search of the office of a Canadian citizen in the Turks and Caicos Islands.   The Supreme Court of Canada determined that the laws of the foreign sovereign, in this case the Turks and Caicos Islands, controlled admissibility in Canadian courts of

the evidence seized on principles of sovereign equality.  R. v. Hape, 2007 SCC 26;  [2007] S.C.J.

No. 26;  2007 Can. Sup. Ct. LEXIS 27 (June 7, 2007).  The decision confirms and exemplifies the

fundamental  importance and vitality today of the principle of sovereign equality:

> (2) Principle of Respect for Sovereignty of Foreign States as a Part of Customary
> International Law and of Canadian Common Law
>
> 40. One of the key customary principles of international law, and one that
> is central to the legitimacy of claims to extraterritorial jurisdiction, is
> respect for the sovereignty of foreign states. That respect is dictated by the
> maxim, lying at the heart of the international legal structure, that all states
> are sovereign and equal. Article 2(1) of the Charter of the United Nations,
> Can. T.S. 1945 No. 7, recognizes as one of that organization's principles
> the "sovereign equality of all its Members". The importance and centrality
> of the principle of sovereign equality was reaffirmed by the General
> Assembly in the 1970 Declaration on Principles of International Law
> concerning Friendly Relations and Co-operation among States in
> accordance with the Charter of the United Nations, GA Res. 2625 (XXV),
> 24 October 1970, which expanded the scope of application of the principle
> to include non-U.N. member states. A renowned international law jurist,
> Antonio Cassese, writes that of the various principles recognized in the
> U.N. Charter and the 1970 Declaration:
>
> [T]his is unquestionably the only one on which there is unqualified
> agreement and which has the support of all groups of States, regardless of
> ideologies, political leanings, and circumstances. It is safe to conclude that
> sovereign equality constitutes the linchpin of the whole body of
> international legal standards, the fundamental premise on which all
> international relations rest.
>
> See A. Cassese, International Law (2nd ed. 2005), at p. 48.

The United States and the Syrian Arab Republic have both ratified the U.N. Charter and

been accepted as Members of the United Nations.  Both the U.S. and the Syrian Arab Republic

are bound by the Charter of the United Nations, the most universally accepted and important

treaty among nations, which embodies humanity's best chance for peace.  Both the United States

and the Syrian Arab Republic have committed themselves to faithfully observe the principle of the

sovereign equality of all U.N. Members, the foundation on which the United Nations stands,

which is essential to the fulfillment of all its purposes.

A decision that FSIA §§1605(a)(7) or §1605A does not violate equal sovereignty because the Congress itself stripped the sovereign immunity of all foreign states equally, then empowered the Courts to hear claims for certain proscribed acts, but only if the foreign state was designated by the Secretary of State a state sponsor of terrorism, since the Secretary of State could designate each and every foreign sovereign denies the obvious truth. The Secretary of State was empowered to designate selected foreign sovereigns, and not all foreign sovereigns, as a foreign policy /political decision. This is what has been done both in placing and removing a selected few on and off the list. Cf. Wyatt v. Syrian Arab Republic, Judgment issued without opinion, 266 Fed Appx 1, 2 (D.C. Cir 2008)("But even if Article 2(1) [of the U.N. Charter] does demand strict equality across states, the provisions are not in conflict because § 1605(a)(7) does not treat Syria (and the other terrorism sponsor states) unequally. Any country can come within § 1605(a)(7)'s exception so long as the Secretary of State designates it a terrorism sponsor.")

The designation process would have no meaning if all foreign sovereigns were to be designated, except to offend every nation. Yet until all are designated, those designated are denied equal sovereignty. If the Congress wanted to make all acts of terrorism by every foreign state against U.S. nationals actionable in the U.S. courts it would not have added the direction that the court "shall decline to hear a claim ... if the foreign state was not designated ... at the time the act occurred."

Justice Scalia writing for a unanimous Court made the discrimination which applies to both §1605(a)(7) and its successor §1605A clear: "In brief, 1605(a)(7) stripped immunity from a foreign state for claims arising from particular acts, if those acts were taken at a time when the

8

state was designated as a sponsor of terrorism." .<u>Republic of Iraq</u> v. <u>Beaty</u> , 129 S. Ct.  2183,

2187  (2009).   Fewer than 10 States have ever been designated.   Only four are currently

designated.

The issue must be of special concern to the judiciary, because it has been made the

principal instrument by which U.S. actions violate the First Principle of the United Nations.   The

federal courts will lose a part of their judicial independence, be complicit in a process in violation

of international law and the Constitution, be seen among nations as a political instrument of U.S.

foreign policy and suffer legislative and executive rescission of their judicial acts including final

judgments if they fail to address this sovereign right to equal sovereignty including juridical

equality.

The U.N. Charter means only to insure the equality of sovereignty for all its Members so

that all will be treated equally as to their sovereignty and cannot take offense that the U.N. itself,

or one, or more of  its Members are discriminating against it by denying it equal sovereignty.

The violation of the Syrian Arab Republic's sovereign equality by the United States acting

through its Courts  under an Act of Congress which authorizes the Secretary of State to designate

politically selected states as sponsors of terrorism and thereby confer jurisdiction over the selected

few, in this case the Syrian Arab Republic, is undeniable.  Of the 192 Members of the United

Nations only a handful have ever been considered, or designated state sponsors of terrorism by

the Secretary of State of the United States.

Few acts of state impinge more directly on the sovereignty of another state than seeking

selectively to subject a sovereign to physical coercion in a foreign Court to adjudicate its conduct,

compel testimony from its officials, even a head of State, or government, the production of

confidential government documents,  impose judgment on its acts, exact damages and inflict

penalties and seek satisfaction of judgments worldwide.

That denial of sovereign immunity by §1605 impacts on matters of State was

acknowledged by §1605(g) which provides that the U.S. Attorney General can obtain a stay of

any request, or order for discovery demanded from the United States by certifying it would

interfere with a criminal investigation, or case, or a national security operation, create a serious

threat of death, or bodily injury, or adversely affect the ability of the U.S. to work with other

sovereigns, or international law enforcement agencies in investigating violations of U.S. law.  Yet

the same intrusions are threatened on the sovereignty of a foreign state under §1605 without its

ability to certify the intrusion would interfere with its government operations.  We have seen the

U.S. executive time and again refuse to release U.S. state secrets to its own courts, yet it now

demands that foreign sovereigns release state secrets to U.S. courts.

§1605A is a form of war by other means because it seeks to coerce an equal sovereign,

order its executives, compel their testimony, force disclosure of state secrets, seize its property,

interfere in its financial transactions, impose draconian penalties, freeze its bank accounts, funds

owed by and to it and place liens on its properties in amounts asserted by private citizens of the

U.S. on the mere filing of a lawsuit.  See §1605A(g).

International law has always and necessarily been based on the equality of sovereigns.

Chief Justice John Marshall spoke eloquently of the principle in the seminal case of the French

Schooner Exchange, which had taken refuge in the port of Philadelphia.   Marshall explained the

supremacy of each sovereign over its own soil and the waiver by every sovereign of a part of its

exclusive territorial jurisdiction, as follows:

10

"Th[e] perfect equality and absolute independence of sovereigns, and th[e] common interest impelling them to mutual intercourse, and an interchange of good offices with each other, have given rise to a class of cases in which every sovereign is understood to wave the exercise of a part of that complete exclusive territorial jurisdiction, which has been stated to be the attribute of every nation."  Schooner Exchange, v. M'Fadden, 7 Cranch, at 137, 11 U.S. 116, 3 L.Ed. 286 (1812)

No other Member of the U.N. has claimed worldwide extraterritorial jurisdiction for its courts over sovereigns it selects.

Except for §1605(a)(7), and now §1605A, which single out U.S. designated "sponsors of terrorism," the Foreign Sovereign Immunities Act treats foreign sovereigns equally,  recognizing their sovereign and juridical equality as required by the U.N. Charter. §1605(a) provides that a "foreign state shall not be immune from the jurisdiction of Courts of the United States or of the States" in any case specified in the section. §1605(a) (1)-(6) dealing generally with cases of waiver of immunity; commercial activity in the United States; property in the United States; personal injury, or death in the United States caused by tortious acts of a foreign state; in effect, codifying the restrictive recognition of sovereign immunity. §1605(b)-(d) deny immunity in admiralty, maritime liens and ship Mortgage cases where nations share jurisdiction.  In all these provisions, FSIA §1605(a)(1)-(6) and §1605(b)-(d), all foreign sovereigns are treated equally.

 Two states, Iraq and Libya, long designated sponsors of terrorism, have been removed from the select list of sponsors of terrorism and as a consequence judgments entered after years of judicial proceedings against them have been nullified, thus violating the finality of judgments of U.S. Courts, threatening the independence of Article III courts and U.S. adherence to the rule of law.   Other States are being considered for removal an event that is desirable and inherent in the fluid politics of international relations.

11

And despite its far reaching international power, the U.S. must expect that in time, nations will retaliate against the U.S. through their courts to  expose the U.S. not only to liability for its direct acts of violence but for acts of the scores of other states that receive military aid and technical assistance from the U.S.

**B.**     **Congress Did Not Intend to Violate the First Principle of the U.N. Charter – The Sovereign Equality of Nations -- by Enacting FSIA §1605(a)(7) and 1605A and Related  Provisions**

Only a law enacted by the Congress that clearly states the intention of Congress to violate the law of nations, or revoke or modify a provision of a treaty entered into by the United States, can alter or rescind international law, or  a treaty entered into by the United States or any of its provisions, that are part of the laws of the United States.

"It has been a maxim of statutory construction since the decision in Murray v. The Charming Betsy, 2 Cranch 64, 118 (1804), that 'an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains...'" .  Weinberger, Secretary of Defense, v. Rossi, 456 U.S. 25, 32 (1982).  See also, United States v.  Palestine Liberation Organization, 695 F.Supp. 1456, 1465 (S.D.N.Y. 1988).

The Congress was aware that laws and agreements involving the immunity of foreign sovereigns are directly and importantly related to friendly, cooperative and harmonious foreign relations and are fpund in customary international law and dealt with in many treaties and agreements, including the Charter of the United Nations.  Congress therefore provided in the Foreign Sovereign Immunities Act of 1976, that its provisions were "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act..."  28 U.S.C. §1604.  This provision subjects the FSIA to the provisions of the U.N.

Charter, above all international agreements, and prohibits the violation of equal sovereignty and juridical equality.

Further, in the proceedings leading to the enactment of §1605(a)(7) and its successor §1605A Congress did not reveal any consideration of U.S. obligations under the Charter of the United Nations, or its first principle set forth in Chapter I, Article 2, paragraph 1, much less Congressional intention to renounce those obligations.   By FSIA §1604, Congress states its intention to abide by the provisions of the U.N. Charter.  The FSIA cannot therefore be construed to revoke the treaty obligations of the United States in the Charter of the United Nations to respect the sovereign equality of all U.N. Members.

Nothing in the words of the FSIA, former §1605(a)(7) or §1605A, or the legislative history of their enactment implies that Congress intended to violate the first principle of the Charter of the United Nations to respect  "...the sovereign equality of all its Members."  It is unlikely that the Congress of the United States would ever do so.

In the legislative history and the Act that gave rise to <u>U.S.</u> v. <u>PLO</u>, Congress made explicit its intention to close the Permanent Observer Mission of the PLO to the United Nations, as well as bar the PLO from any presence in the U.S.  The Congress made no reference, however, to the United Nations Headquarters Agreement, a treaty between the U.N. and the U.S.

The legislation and case arose at an extremely emotional and heated time in the Middle East and high U.S. hostility toward the PLO.

The District Court reviewed the Headquarters Agreement, determined that Congress had violated its protection of U.N. invitees to the U.N. Headquarters in New York and  found further that Congress had not manifested an intent to violate the Headquarters Agreement.  On the

13

authority of the <u>Charming Betsy</u> and <u>Weinberger, Secretary of Defense</u> cases cited above, the

Court therefore dismissed the complaint of the United States seeking closure and removal of the

Mission from the U.S.

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts".

<u>Argentine Republic</u> v. <u>Amerada Hess Shipping Corp.</u>, 488 U.S. 428, 434 (1989).  If Congress

chooses to authorize claims against foreign sovereigns in U.S. Courts, in violation of the Charter

of the United Nations for acts described in §1605(a)(7), it will have to affirmatively state its

intention to do so.  This it has not done.

> **C.** **Designations under §1605(a)(7) and its successor §1605A by Violating the Equal Sovereignty of U.N. Members Designated State Sponsors of Terrorism Have Seriously Impaired Efforts to End the Scourge of War, Harmed the Peoples of the United Nations, Damaged the United States in the Conduct of Its Foreign Relations and Assaulted the Foreign States it has Unilaterally Labeled Terrorist and Attempted to Selectively Hold Subject to the Jurisdiction of U.S. Courts**

§1605A and its predecessor §1605(a)(7) of the Foreign Sovereign Immunities Act, seek to

confer unprecedented extraterritorial jurisdiction on the Courts of the United States over foreign

sovereigns acting in their own territory or in other lands outside the U.S..  Here, the Court is

asked to adjudicate alleged activity of the government of the Syrian Arab Republic in Syria and in

Turkey where the U.S. government has provided billions of dollars in military aid and which has

effective and functioning law enforcement agencies and judicial institutions.

A unanimous Supreme Court has held, addressing §1605(a) that " ... the law was intended

as a sanction, to punish and deter undesirable conduct.".  <u>Beaty</u>, <u>supra</u>, 129 S.Ct. at 2191.  The

plaintiffs, are a minuscule number among thousands of victims.   The sums sought are staggering

by any measure.  The sanctioning of a foreign sovereign for the enrichment of a few victims

compounds the violation of sovereign equality.

The identical criminal conduct alleged here, or the same or similar "terrorist"acts, a hundredfold more deadly, if committed by any of the 192 Members of the U.N., or their officials, including the U.S., which are not designated a state sponsor of terrorism can not be pursued in U.S. courts.  Nor can nationals of a state designated a sponsor of terrorism by the U.S. sue the U.S., or any other nation that may have inflicted equal, or greater injuries or death on them because of sovereign immunity, compounding the denial of equal justice under law, unless their nations enact and are able to enforce through their courts legislation stripping other nations they choose of sovereign immunity.

Cases brought under §1605(a)(7) and §1605A make the U.S. Courts and U.S. law an aggressor enforcing the present political agenda of the Executive Branch of the U.S. acting on a discriminatory basis seeking exorbitant rewards for U.S. citizens alone and punishing the selected foreign sovereigns with sanctions.   And when the political winds change, as they do constantly, the Executive branch has and will again file Statements of Interest and take other actions aborting the labors of the judiciary for political reasons, rendering the federal courts powerless, their judgments cruel jokes.

Opposition to the legislation was forcefully stated by the U.S. Department of State in hearings preceding enactment of §1605(a)(7).   See, e.g. the cogent criticism of  S. 825 by Jamison S. Borek, Deputy Legal Advisor, Department of State, testifying before the Subcommittee on Courts and Administrative Practice of the Senate Committee on the Judiciary, considering Foreign Terrorism and U.S. Courts, June 21, 1994, against enactment of S.825, 4th unnumbered page of ("States are generally reluctant to enter into the domestic courts of another

state to defend themselves against charges of serious violations of law.")  See also the

recommendations for compensation for victims of terrorism in the Testimony of William H. Taft,

IV, Legal Advisor, U.S. Department of State, Committee Hearing, Senate Foreign Relations

Committee,  Hearings on Benefits for Victims of Terrorist Attacks, July 17, 2003.


D.      **The Power of the U.S. Secretary of State under FSIA §1605(a)(7) and §1605A to Designate a Foreign State a Sponsor of Terrorism and the Procedures Followed are Lawless, Antithetical to the Rule of Law and Endanger the Independence of the Federal Judiciary.**

There are no criteria or procedural requirements for the Secretary of State's imposition,

continuance, renewal or withdrawal of the designation of a state as a "sponsor" of terrorism.

Federal courts processing cases brought under §1605(a)(7) and §1605A cannot inquire into the

basis for the Secretary' designation and can be left in limbo at any moment before or after final

judgment in the proceeding, their judgment aborted after years of litigation and toil by a political

decision of the executive branch, or the Congress.

Both of the statutes cited in §1605(a)(7) and §1605A as the source of the designation

"state sponsor of terrorism," the Export Administration Act of 1979 and the Foreign Assistance

Act of 196,1 provide for a determination by the Secretary in the same language, that "the

government of such country" has "repeatedly provided support for acts of international terrorism."

§1605(a)(7) contains no definition of "terrorism" or "sponsor of terrorism"  for the Secretary to

employ in making a designation under the section , despite other definitions provided in §1605(e),.

A definition of "state sponsor of terrorism" was finally added in 2008, §1605A(h)(6).  But under

both versions of the "terrorism exception" no notice of the designation is given to the foreign state.

There is no hearing or record required.  No formal decision or informal explanation whatsoever is required of the Secretary.  There is no provision for administrative or judicial review of the designation's imposition or continuance.  No attempt, even a feeble one, at due process or fundamental fairness is required by the statute.   No identification or findings are required with respect to the nature and extent of the state's purported sponsorship of terrorism.    And on this basis, a foreign nation is deprived of its equal sovereignty before U.S. courts in violation of the first principle of the United Nations and subjected to sanctions by an equal sovereign.

The procedural and other requirements imposed by a statute such as 8 U.S.C. §1189, which authorizes the Secretary of State to designate an organization as a "foreign terrorist organization," meager as they are, stand in sharp contrast to the completely undefined, unfettered, unstructured, unreviewable power §1605(a)(7) and §1605A confer on the Secretary to designate foreign states as sponsors of terrorism.

All designations to date were made under §1605(a)(7).  They have been overtly political and predictable, as have rescissions.   Few states are selected and all states selected are consistently treated in various ways by the executive and legislative branches as enemies of the United States, even evil empires.  See e.g.  27 CFR 478.11, cited supra , defining a friendly foreign government as one that has not been identified as a State sponsor of terrorism.    Our fixation on four acts of terrorism listed in the FSIA's terrorism exception has rendered those acts more harmful to friendship with foreign governments than wars of aggression, genocide and crimes against humanity.

The designation as a sponsor of terrorism is obviously one that has never been imposed on an ally, a client state, or  friendly nation, no matter how open and notorious its terrorist conduct

17

has been.  Removal of the designation of state sponsorship of terrorism has been equally political and protective of U.S. political and economic interests while demeaning the independence and commitment to the rule of law and of Article III power,  the dignity of U.S. Courts and U.S. devotion to the rule of law.

The determination that a state is a "sponsor" of terrorism under §1605(a)(7) and §1605A apart from denying the state equal sovereignty and depriving  it of sovereign immunity is not supposed to have any function or meaningful significance in the operation or application of the statute other than selecting the states to be deprived of their sovereignty.  There is no requirement that there be any causal, or other relationship  between any factual basis for the designation of a state as a sponsor of terrorism and the terrorism alleged in a law suit.  Nor is it required .that findings of the Secretary include acts similar to those defined in §1605(a)(7) or §1605A.

While a sufficient causal connection or nexus must be shown between the conduct of a defendant state that is designated in §1605(a)(7) or §1605A in order to establish subject matter jurisdiction and  to find  liability  – that one of the four proscribed acts of  terrorism or support for the act has occurred – the Secretary is free of any such requirement in making her designation.

The absence of any requirement that there must be a connection between the basis for a designation by the Secretary and any action based on the designation filed against such a state in a U.S. court is added confirmation of Congress' intention that a designation under§§1605(a)(7) or §1605A  is solely for political ends against disfavored or enemy states,  not against friendly nations and not for the purpose of deterring terrorist violence generally, but to demean nations that defy U.S. authority.

II.   **The Syrian Arab Republic has Responded in this Case as a Courtesy to the United States Hoping that by Reasoning Together in U.S. Courts this Harmful and Unlawful Sanction can be Ended and a Step Toward Better Relations Taken**.

The Syrian Arab Republic has responded to this lawsuit brought against it in U.S. Courts by private parties under §1605A solely to contest U.S. claims to jurisdiction over it in violation of its sovereign equality as a matter of courtesy to the United States.  Failure to appear can result in default judgments that strain relations and create friction and difficulties between  nations that may take years to resolve.  Such tensions can lead to conflict.  It is better to consider and resolve any jurisdictional questions at the threshold and avoid protracted conflict and tension between the United States and U.N. Members the U.S. Secretary of State designates State Sponsors of Terrorism..   It is hoped that by reasoning together it can be agreed that the statute under which this case is brought violates the Charter of the United Nations and customary international law.

It is helpful to consider that other nations will have different opinions about which nations are sponsors of terrorism.  The United States has military personnel posted around the world and is engaged in major armed conflict in several countries.  It provides vast military aid, police training, observers, personnel, intelligence and motivation to the use of force to scores of nations frequently accused of terrorist acts and human rights violations, including in the Middle East area alone, Egypt, Israel, Pakistan, Saudi Arabia, and both the former and present governments of Iraq and Afghanistan.  If the U.S. perseveres in its failing effort to select sponsors of terrorism other nations whose citizens are victims of violence by such nations may in time  decide to authorize suits against the U.S. for committing and sponsoring  terrorism, holding the U.S. responsible for resulting deaths and injuries though most will realize that for now their power to intercept or disrupt international banking activities, economic transactions, and property transfers or seize U.S. assets

19

is comparatively feeble.

For any nation to unilaterally assume authority to deprive other nations of their equal sovereignty and to sanction other nations by selectively authorizing suit against them for acts occurring on their own soil, or part of the world and seek to assert its judicial power over that nation where international law prohibits such use of judicial power, threatens the breakdown of international law and the ability of the United Nations to pursue its many important purposes. Such designations of state sponsors of terrorism are arbitrary, inherently political, made unilaterally and secretly against selected "enemies" – the evil empires – as sanctions, or punishment to coerce conduct and then create international hostility and tensions against the United States, inviting retaliation, crippling the capacity of the United Nations and international law to end the scourge of war.

### III.    This Case Presents Non-Justiciable Political Questions

This case is not an ordinary tort case constitutionally vested in the jurisdiction of U.S. Courts. But terrorism cases are often misconceived as such. See e.g.. Estates of Ungar v. Palestinian Auth., 228 F. Supp. 2d 40, 50 (D.R.I.2002)("... the case at bar should be regarded as an ordinary tort suit properly placed in the hands of the judiciary").

The events occurred on the far side of the planet where writs from U.S. Courts have no power to coerce conduct, compel compliance with discovery and other orders essential to the judicial function and where they intrude on the authority of foreign sovereigns and the laws, customs and living standards of the people and, as we have seen with Iraq and Libya, the foreign policy of the United States. The very Congressional authorization for the selective denial of sovereign immunity, an act by the first political branch, the legislative, empowering the second

20

political branch, the executive, to designate state sponsors of terrorism created private litigation immersed in volatile and fluid political questions which the judicial branch should have never entertained.

The attempt to exercise U.S. judicial power over Syria, its ministries, officials and treasury for governmental acts of state, wears the mantle of  imperialism , not the rule of law.  It denies Syria sovereign equality and threatens economic warfare through the U.S. courts on the Syrian people measured by U.S. standards for liability, economic damages determined in a far richer country than theirs by its materialistic values.

Adding insult to injury, it claims authority to compel testimony from the head and high officials of government and compel production of the most sensitive secrets of state.  The cases themselves declared sanctions by the U.S. Supreme Court, include, as well, the claimed authority to impose punitive damages on a sovereign state, to place a lien on assets of  that government in the amount of damages claimed, exceeding a billion dollars in some cases, on the first day the case is filed, all against the  material well being of the Syrian people and the dignity of their government.

The near half a billion dollars in damages and penalties originally assessed against Syria in a default judgment for the deaths of  two Americans murdered in Iraq by Al Qaeda in Iraq in <u>Gates</u> v. <u>Syrian Arab Republic,</u> 580 F.Supp. 2d 53 (DCD  2008)(RMC), among the thousands of American deaths that have occurred in Iraq since the U.S. invasion in 2003 and the hundreds of thousands of Iraqi deaths can only fill Syrians and most of the rest of the world with wonder at the unilateral monetary demands U.S. laws place on American deaths and  America's non-accountability for the lives it takes.  With a gross domestic product per capita of $7,000, it would take 30,000 years for the average Syrian to earn the sum initially awarded for the death of one

21

American in <u>Gates</u>.

That the enactment of FSIA §1605A makes the judiciary of the United States an even greater political instrument of U.S. foreign policy is clear.

To read the complaint in this case, or any case brought under these unprecedented amendments to the FSIA which selectively deprive a handful of foreign sovereigns of their immunity in U.S. courts in violation of the First Principle of the U.N. Charter for the four acts specified in the amendments, is to know that Congress is making the judiciary an instrumentality of U.S. foreign policy to impose sanctions on a foreign state until the foreign policy changes.  The judiciary is involved in the pursuit of temporal political goals amidst the vicissitudes of U.S. foreign policy to assist in accomplishing the fleeting foreign policy purposes of the political branches.

To read the complaint filed by plaintiffs is to see that the Court is asked to find facts on political issues of extreme sensitivity beyond its competence to obtain demonstrable facts and weigh reliable evidence and beyond even the ability of U..S. intelligence agencies and those of any other nations which spends billions of dollars on highly sophisticated and intrusive methods and efforts, including highly trained spies and informers to gather information about activities of foreign governments.

As an example of the difficulty of obtaining such evidence, is the question whether Israeli Sgt. Zachary Baumel, listed as missing in action by Israel at all times since the battle at Sultan Yaqub, Lebanon on June 11, 1982, in Syrian custody?  See <u>Baumel</u> v. <u>Syrian Arab Republic</u>,, ___ F.Supp.2d ____, 2009 U.S. Dist. Lexis 102368, 06cv682 (DCD 2009)(RMC)..  Despite years of effort Israel admits to having no evidence that Sgt. Baumel survived the battle at Sultan Yaqub, is alive, or is in Syrian custody.   Can plaintiffs hope to discover verifiable evidence concerning an

Israeli soldier missing in action that has eluded Israeli intelligence for 27 years?  Can a U.S. Court credibly evaluate such evidence?  On November 3, 2009, the District Court dismissed the <u>Baumel</u> case because of the inability of plaintiffs to allege plausible facts, not mere speculation, sufficient to support a cause of action.The complaint in this case raises as issues for the Court many other highly political and controversial questions to be resolved.

The issues found in the complaint raise questions of fact of importance to the U.S. in determining its political position and foreign policy toward Syria and general question of the political relationship our government should seek with countries where such questions exist.  If the Courts provide their answers usually on uncontested evidence they intrude on the foreign relations policy powers of the political branches on questions they have slight capacity, if any, to decide. Every U.S. President, Secretary of State and other high foreign policy officials since 1977, at least, has spent enormous amounts of time in office dealing specifically with political questions involved in finding peace in the Middle East.

These very political questions are "inextricably intertwined" with ongoing foreign policy and political decisions to be made by the political branches of the U.S. government and are beyond the competence of the judiciary to answer.

Political questions reserved to the political branches necessarily include not only political decisions that have been made and actions  the political branches have taken in the past, but all political questions inextricably intertwined, past, present and future with Congressional and Executive considerations of foreign policy decisions to be taken in determining the foreign policy of the United States.

The Constitution is as concerned with protecting future foreign policy decisions of the political branches from judicial intervention as it is in protecting past foreign policy decisions from judicial review.   See, e.g. <u>Bancoult</u> v. <u>McNamara</u>, 445 F.3d 427, 433 (D.C. Cir 2006);  <u>Hasbury</u> v. <u>Hayden</u>, 522 F.3d 413 (D.C. Cir. 2008); <u>El-Shifa Pharmaceutical Industris</u> v. <u>U.S.</u>, 559 F.3d 578 (D.C. Cir 2-1, decided  March 27, 2009; Petition for Rehearing and Rehearing En Banc pending, U.S. opposition filed at Court's request, June 18, 2009.

Articles I and II of the Constitution of the United States delegate all the powers possessed by our federal government to conduct foreign policy to the Congress and the Executive.  These are the political branches of government empowered to decide political questions and conduct the political affairs of our nation limited only by powers vested in the Judicial Branch or reserved to the States and the people and by rights protected within the Constitution, the Bill of Rights and subsequent Amendments.

The Judicial Power is vested in the Supreme Court and such lesser courts as Congress has and may yet establish.  The integrity of the rule of law, the fundamental principle of every nation of laws, depends utterly on the independence of the judiciary from external politics and interest, its consistent refusal to address political questions and its strict adherence to legal principles.

For the Judiciary to become involved in political questions is to erode the rule of law, make Courts mere instruments for advancing political policies and deprives the people of the blessings of a government of laws in which fundamental principles prevail over political expediency.

The Supreme Court has made clear that the Constitution confers all power over foreign affairs to the Congress and the Executive, the political branches.  It has also expressed specific concern that courts abstain from involvement in the politics of foreign relations: "Matters

24

intimately related to foreign policy and national security are rarely proper subject for judicial intervention." Haig v. Agee, 453 U.S. 280, 292 (1981).

FSIA §§1605(a)(7) and 1605A are more than intimately intertwined with foreign policy, they implement it, but are frozen in time to the policy at the time a foreign sovereign was designated a state sponor of terrorism.  With Iraq and Libya we now see the obvious.  Foreign policy changes..   The U.S. Court of Appeals for the District of Columbia Circuit has repeatedly acknowledged  in recent years that foreign relations are "quintessential sources of political questions." Bancoult v. McNamara, 445 F.3d 427, 433 (D.C. Cir 2006), see, e.g. Hasbury v. Hayden, 522 F.3d 413 (D.C. Cir. 2008); Gonzalez–Vera v. Kissinger, 449 F.3d 1260 (D.C. Cir. 2006); Schneider v. Kissinger, 412 F. 3d 190 (D.C. Cir. 2005).

The political motives behind the enactment of the original Anti-Terrorism Act of 1990, reenacted without substantive change in 1991, were approved by voice vote in both Houses of Congress without a dissent recorded as a floor amendment to an unrelated bill in the acknowledged and highly emotional reaction to the murder of Leon Klinghoffer.  The amendments created a civil cause of action for international terrorism against individuals and organizations and were concerned directly with the Palestine Liberation Organization, but not foreign states, 18 U.S.C. §§2331, et seq..        The amendments to the FSIA adding the state sponsor of terrorism provisions in April 1996, codified at FSIA §1605(a)(7),  and amendments enacted on  January 28, 2008, codified at §1605A  authorizing the selective stripping of sovereign immunity by designation of the Secretary of State to then be processed  in private cases before U.S. Courts against a few selected U.N. Members,  reveal an intense political desire to pursue and harm the designated U.N. Members, political enemies of the moment, evil empires, no less.   But they involve the Courts of

the United States in political questions necessarily prohibited by the U.S. Constitution to a assure a government of laws

The Supreme Court confirmed the punitive purpose of the Congress in Republic of Iraq v. Beaty , supra,, 129 S. Ct. at 2191, finding  "...the fact that §1605(a)(7) targeted only foreign states designated as sponsors of terrorism suggests that the law was intended as a sanction to punish and deter undesirable conduct"

 No one who reads the daily newspapers, watches the evening international news on TV or hears it on the radio could doubt that there are many countries which have committed one, or more of the four acts prescribed in the FSIA §§1605(a)(7) or 1605A or furnished material support for those acts, including our own.  But only a select few determined by foreign policy considerations are denied their sovereign immunity in U.S. courts.

Consideration of the tests for non-justiciability set forth in Baker v. Carr demonstrates that political questions are raised in this case.

> ...Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.  369 U.S. 186, 217 (1962).

The tests in Baker v. Carr have been applied to and served longer in more fields of human activity and judicial review  without significant judicial criticism, or adaptation, than any other

26

Supreme Court decision that comes to mind.  Yet the political questions that might arise in cases involving the judicial reapportionment of legislative electoral districts in the U.S. seem quite remote from the political questions that may occur in determining U.S. foreign policy questions arising from varied acts of violence in Palestine, Israel , Iraq and elsewhere around the world. And the Baker tests, for all the wisdom they reveal, serve awkwardly in determining whether political questions infect the exercise of  jurisdiction over a politically selected sovereign, Syria, for alleged sponsorship of acts of terrorism by third parties  in a neighboring foreign jurisdiction, Israel.

Even so, FSIA §§1605(a)(7) and 1605A as applied in this case fails all six Baker tests.

(1) The Constitution clearly commits issues of foreign relations and policy to the Executive and Legislative branches.  For the Judiciary to be empowered to litigate issues against a foreign sovereign concerning its acts of state and necessarily make highly political and inflammatory findings of fact concerning secret policies and acts of a foreign sovereign and its relationship with other foreign sovereigns and political organizations on foreign soil immerses U.S. courts in distant, indeterminable and dangerous foreign political questions.

To deprive that sovereign of an interlocutory appeal of an adverse decision that the Court has personal and subject matter jurisdiction, make findings of fact about its confidential State policies and official acts affecting the U.S. and U.S. citizens, assess damages and authorize freezing of assets in the amount of damages alleged in a complaint upon its filing all amidst the highly charged  political emotions of a case against foreign enemies with foreign cultures and economic standards of  living, seeking to coerce their highest officials, ministries and personnel to reveal facts, including state secrets of a nature the U.S. executive would refuse to reveal to the Congress,

27

or in U.S. courts and pay punitive damages, reveals a  political motive, and only temporary, to

punish that sovereign through U.S. courts and  is an impermissible judicial participation in the

conduct of foreign affairs which can be reassessed by the political branches at any time,  addressing

political questions not permissible for judicial consideration by the Constitution and subjecting

judicial proceedings and judgments to revocation by Congress, or the President.

 (2) The Judiciary lacks discernable and manageable standards and means for resolving

issues presented because it has no legal, or principled standards, or authority for political decision

making, no power over defendants, or even plaintiffs who are usually foreign residents except

dismissal,  default judgment and largely unenforceable contempt orders, sanctions and damages.

All the sources of U.S. intelligence and investigative agencies and resources of allies could not

discern whether, or prove, Iraq had weapons of mass destruction and even the executive war

against Iraq., and its occupation and search found none.   Are U.S. Courts authorized by the

Constitution and competent to make reliable findings of fact through judicial processes when facts

are so remote, politicized and obscure, so importantly secret,  on matters of such great political

and economic importance and nature, on incomplete evidence provided by private parties seeking

damages from limited available sources, or evidence or opinion from executive agencies, interested

foreign government reports, agents and persons beyond the reach of judicial power?

 (3) It is impossible for courts to decide questions raised by cases brought under FSIA

§§1605(a)(7) without an initial policy determination by the political branches that a foreign

sovereign is a state sponsor of terrorism, a determination Courts cannot credibly make that itself is

a political determination, and as made by the Secretary of State, an executive determination not

subject to judicial review that can be changed at any time, as has been seen.

(4) It is impossible for the Judiciary to decide an accused foreign sovereign committed a heinous crime without impugning its honor while supporting U.S. foreign policy or that the foreign sovereign sued did not commit one or more of the four terrorist acts specified in the statutes without at least partially impugning the Secretary of State's finding that the foreign sovereign was a state sponsor of terrorism involved in the commission of of such crimes.

(5) The finality of the Secretary of State's finding that the foreign sovereign was a state sponsor of terrorism places undue pressure on the Judiciary for unquestioning adherence to a political decision already made, and subject to change at any time by Congress or the President whether for reasons politically expedient, or highly principled. .

(6) The potential of U.S. embarrassment for multifarious pronouncements by the judiciary and the political branches on the same questions is present since the political branches often make numerous even inconsistent statements on the specific incidents that come before the courts.

Perhaps nothing more clearly demonstrates the political nature of the foreign policy questions presented to the judiciary by FSIA §§1605(a)(7) and 1605A than the political reversals by the President and the State Department of designations of foreign sovereigns as sponsors of terrorism applied retroactively to cases in litigation for years and even after final judgment by Courts of the United States making judicial decisions on which the rule of law ultimately depends a mere servant of the political branches, dismissible at will.

This has happened with two of the seven foreign sovereigns that have been designated state sponsors of terrorism, Iraq and Libya, and is the subject of negotiation with others. It will doubtless happen again as alliances and power relationships change. Indeed if the removal from the sponsor of terrorism list reflects a bona fide belief by the executive of a sincere change away

29

from a claimed previous policy of sponsoring terrorist acts, we should all celebrate.  But we cannot celebrate  at the expense of our independent judiciary whose final judgments must be inviolable if we are to live under the rule of law..

See, Applicability to Iraq.  Act Jan. 28, 2008, P.L. 110-181, Div A, Title X, subtitle F, §1083(d), 122 Stat. 343 empowering the president to waive any provision of this section with respect to Iraq.  President Bush  made the required determination purporting to remove Iraq from all proceedings, liability, judgments and jurisdiction under FSIA §1605(a)(7).   The Supreme Court has now held in Beaty that Iraq's exposure to liability under §1605(a)(7) ended in May 2003 when the President exercised his authority under the Emergency Wartime Supplemental Appropriations Act , 117 Stat. 559, section 1503 to make the section inapplicable to Iraq and the District Court lost jurisdiction. See Republic of Iraq v. Beaty , 129 S. Ct. supra at 2194.  Iraq has been removed from the state sponsor of terrorism list .

See, also, Libyan Claims Resolution Act of August 4, 2008, P.L. 110-301, 122 Stat. 2999, in which it is stated  "Congress supports the President in his efforts to provide fair compensation to all nationals of the United States who have terror-related claims against Libya through a comprehensive settlement pursuant to an international agreement between the "United States and Libya as part of the process of  restoring normal relations between Libya and the United States ." The Act aborts all previous cases and final judgments against Libya by U.S. citizens under FSIA §1605(a)(7)., including those involving Pan Am flight 103.  The agreement set equal amounts for deaths of U.S. citizens and the U.S. agreed to the amount of $300 million dollars for Libyan deaths and destruction from the U.S. air strikes on Tripoli and Benghazi, Libya in 1986.  See, Saltany v. Reagan, 886 F.2d 438 (D.C. Cir. 1989), in which counsel for Libya who are also counsel for Syria

30

in this case were sanctioned for "audacity" in filing the claims.  Libya has been removed from the state sponsor of terrorism list.

See also, Acree v. Iraq, 370 F.3d 41 (D.C. Cir. 2004) cert.denied 544 U.S. 1010 (2005), in which 17 U.S. citizens held in Iraq in 1990-91 at the beginning of the Gulf War were awarded over $959 million in a final judgment of the U.S. District Court in Washington, D.C. only to have it set aside after the Executive Branch intervened to nullify the final judgment of a U.S. District Court. The Acree plaintiffs then attempted to pursue their complaint in the District Court which rejected the case because the Court of Appeals in the previous appeal in the case had dismissed the complaint on a separate dispositive issue,   565 F.Supp.2d 128 (D.C.D. 2008)(RWR).   The Court of Appeals summarily affirmed the District Court's refusal to allow further proceedings on the complaint in an unpublished per curiam order, 2009 U.S. App. LEXIS 3281 (D.C. Cir. February 17, 2009).

Justice Scalia explained in Republic of Iraq v. Beaty, 129 S. Ct. supra at 2194, that "Because Iraq succeeded in having the claims against it dismissed on other grounds ... it could not seek certiorari to challenge the D.C. Circuit's interpretation of the EWSAA," the Emergency Wartime Supplemental Appropriations Act which the Supreme Court upheld in Beaty.

On May 4, 2009, Rep. Joe Sestak introduced the Equitable Compensation for American Victims of Torture Act of 2009, H.R. 2241, to compensate the Acree plaintiffs and others after exhaustive litigation and a final judgment in favor of the Acree plaintiffs was aborted by the Executive Branch in the exercise of its political powers over the foreign policy of the United States.

The Judiciary must act now to protect the integrity of its Article III powers to preserve its

31

independence from legislative and executive political influence and to protect the rule of law.

It is apparent that the efforts of the Congress to confer jurisdiction on federal courts over cases arising from terrorist acts abroad where foreign sovereigns have allegedly sponsored terrorism is impermissible under the Constitution because it presents pervasive political questions inherent in the conduct of foreign affairs that are for the political branches to address.   The foreign policy of the U.S. will change, as everyone who wants peace must hope, when relations with hostile sovereigns change.   As Justice Scalia observed in <u>Beaty</u> "Foreign sovereign immunity 'reflects current political realities and relationships' and its availability (or lack thereof) generally is not something on which parties can rely 'in shaping their primary conduct.' <u>Republic of Austria</u> v. <u>Altmann</u>, 541 U.S. 677, 696 (2004); see also *id.*, at 703 (SCALIA, J., concurring)." <u>Beaty</u> , 129 S. Ct. <u>supra</u>, at 2194.   A statute or Executive Order that imperils the finality of judgments is unconstitutional.   A statute or Executive Order that seeks to impose jurisdiction on U.S. courts to decide political questions is unconstitutional.

The amendments that added the terrorism exception to the FSIA in April 1996, empowering the Secretary of State to strip individual foreign sovereigns of their immunity and vesting jurisdiction in U.S. courts to adjudicate cases alleging any of four terrorist acts committed against U.S. nationals anywhere in the world, have been great failures, and harmful to our Courts, their litigants and our foreign relations.   They are an extreme example of inequality, exempting nearly all nations and threatening crushing damages on poor countries while nearly all victims of terrorist acts never have a day in court and those U.S. citizens who do have often found frustration, and little else.

Except for default judgments which have been common, only a few cases have reached

judgment assessing damages..   The litigation histories of all the cases has been slow and tortured

and except for the freezing of funds of Iran, Cuba and perhaps one, or two other countries, some of

whose funds frozen by the U.S. have been obtained by parties who had default judgments, few

plaintiffs have recovered any significant property, or money for all their efforts and expense.   But

the cases contain the lure of a pot of gold.   The litigation has been a frustration for the Courts,

time consuming and costly.  Now we have seen even final judgments of U.S. courts voided by

Congress and the President.

The January 28, 2008 amendments to the FSIA authorizing immediate freezing of all

properties and funds of defendants in the U.S. forum district from the time a case is first filed up to

the total amount demanded by plaintiffs in the complaint is just another example of the political

extremes to which the Congress has gone to show how politically important it is to hate a select

few "terrorist"states.  The amendment violates the Fifth Amendment to the Constitution and is

fundamentally unfair by depriving defendants of their property on the filing of a complaint against

them without any adjudication or other due process of law.   Such a provision for all civil litigation

in the U.S. would create economic chaos, paralyze commerce and drive corporate and individual

defendants to desperation.

The major effects of this legislation include extreme frustration and disappointment for

many plaintiffs of whom more than a few have fallen by the wayside long before judgment.    For

defendants the laws have caused anger and hostility.  For the Executive Branch the result has been

impediments to peace processes, occasional interventions into  judicial proceedings and the anger

of plaintiffs whose cases, because of delays  even with defaults and those with monetary judgments

may be lost because of changed U.S. foreign policy and uncollectible if left to stand.

For the federal Judiciary among the effects have been  some degree of erosion of
international confidence in and respect generally held for American courts as non-political,
independent and committed to the rule of law.   The statutes reflect an imperial conception of U.S.
sovereignty, the world-wide jurisdiction over cases brought by its citizens alone claiming to be
victims of terrorist acts sponsored by foreign sovereigns and rendering enormous and punitive
monetary awards to the select few, the American abroad.  The vast majority of the victims of those
same "terrorist" acts have no remedy.   Thousands and more, generally the poor, also victims of
terrorism,  often in the same countries have no hope for compensation for deaths and injury and see
huge judgments sought and sometimes entered by U.S. courts against their own country  and
disregard for its equal sovereignty of other nations.  And they see U.S. courts as being so weak that
the U.S. Executive can set aside even the finality of their judgments as U.S. courts continue to
process cases to whatever frustration they may lead.


IV.     **FSIA §§1605(a)(7) and 1605A Expose the Finality of Judgments of Article III
        Courts, an Essential Attribute of Judicial Power, to Legislative and Executive
        Nullification and Are Unconstitutional**

        The constantly changing nature of the political questions inherently involved in the conduct
of foreign relations by the political branches necessarily limits the jurisdiction that Congress can
confer on U.S. Courts by legislation that is closely related to foreign affairs.  As noted above, the
Court of Appeals for the District of Columbia has repeatedly observed that foreign relations are
"quintessential sources of political questions" Bancroft v. McNamara, 445 F.3d 427 , 433(D.C.Cir.
2006).

All the legislation creating federal court jurisdiction to adjudicate claims for deaths and injuries caused by "terrorist" crimes abroad against U.S. nationals has been enacted in a highly politicized time of emotional fear of terrorism or during the "war on terrorism." The political motivation in the enactments has been manifest at the time, as has their temporal nature.

The probability that U.S. foreign policy toward the targets of the legislation and the exercise of power delegated to the Secretary of State to select sovereigns to be designated sponsors of terrorism would change was not only clear at the time, but was a constant goal of foreign policy makers and proponents of the legislation. Whether by defeating them militarily, or economically, a change in their policies, or the need to form new alliances, our foreign policy seeks to make allies of enemies, or at the very least cool hostility, albeit on acceptable terms.

The change in U.S. foreign policy, however tenuous, has come with two sovereigns heretofore subject to suit under the state sponsor of terrorism exception to sovereign immunity, Iraq and Libya. The changes in policy have wiped out years of extensive judicial toil and dissolved final judgments into nothingness. We can be sure change will come with others, or all, of the remaining five "state sponsors of terrorism." President Obama has expressed his intention to change our relationship with all the selectively designated sponsors of terrorism with Syria apparently high on the list.

Legislation concerned with activity that is inextricably intertwined with foreign policy is an area where Congressional expansion of the jurisdiction of U.S. Courts should be authorized only with great care and scrutinized by the judiciary with the care that the preservation of Judicial independence and the integrity of the Rule of Law require.

The "more perfect Union" was in its infancy when Hayburn's case was filed in a U.S. Court

35

in 1792.  The Constitution became effective on June 21, 1788.   The first Congress convened on

March 4, 1789.   The Congress established a Supreme Court, 13 district courts and three <u>ad</u> <u>hoc</u>

circuit courts on September 24, 1789.  The Supreme Court composed of a Chief Justice and five

Associate Justices convened for the first time on February 2, 1790.   Supreme Court members were

never closer in time to the drafting of the Constitution and its original intentions.

      Two of the Justices who reviewed <u>Hayburn's</u> case, James Wilson of Pennsylvania and John

Blair of Virginia, James Madison being Virginia's only other delegate, were delegates at the

Convention and signed the new Constitution.  Wilson was one of the most active and effective

delegates at the Convention.

      The Hayburn Court, alert and concerned for the independence of the judiciary under the

new Constitution, and particularly for the lower courts created by Congress under Article III,

immediately and vigorously objected to the attempt to impose nonjudicial fact finding functions on

judicial officers made reviewable by the Secretary of War as a violation of the new Constitution.

      The Congress, equally close in time to the birth of the Constitution, with many of its

Members, delegates at the Convention, readily corrected its error.

      "Since 1792 the federal courts have emphasized finality of judgments as an essential

attribute of judicial power."  T<u>he Constitution of the United States of America, Analysis and</u>

<u>Interpretation</u>.  99th Congress, 1st Session, Senate Document 99-16 at p. 633.  In 1792 Congress

authorized the filing of pension claims by Revolutionary War veterans in the Circuit Courts.   It

directed the judges to certify to the Secretary of War the amount of the veterans disability and the

Court's  opinion of the percentage of monthly pay to be made, but granted the Secretary authority

to withhold payments to claimants determined by the courts to be entitled to a pension if the

Secretary determined there was some "imposition, or mistake." Act of March 22, 1792 1 Stat. 243.

The Justices were themselves on circuit at the time Congress acted almost immediately they sent their objections to the President, stating the statute was unconstitutional because the duties imposed by the act were not judicial and subjection of a court's decision to revision, or control by the executive or legislative branches was not authorized by the Constitution.

Attorney General Edmund Randolph, informed of the courts refusal to act as directed by the statute, filed a motion for a writ of mandamus in the Supreme Court, seeking an order directing the Circuit Court to proceed on the  petition of a veteran named Hayburn who sought a pension.

The Supreme Court heard argument, but delayed decision, apparently because it learned that Congress was acting to rescind the objectionable features of the act.  The Supreme Court dismissed Hayburn's suit.  Hayburn's Case, 2 Dall(2 U.S.) 409 (1792)) and the Congress enacted a new pension law without the objectionable features, Act of February 28, 2793, 1 Stat. 329.   Some of the Justices had announced their willingness to serve as commissioners,  but not in their capacity as judicial officers.   Fortunately the Congress and the Supreme Court understood immediately in so seemingly minor a matter that the independence of the judiciary and the integrity of the rule of law were at risk.

"Hayburn's Case has since been followed so that the Court has rejected all efforts to give it and the lower federal courts jurisdiction over cases in which judgment would have been subject to executive or legislative revision."   The Constitution of the United States, Analysis and Interpretation, op.cit. at 634, citing United States v. Ferreira, 13 How (54 U.S.) 40 (1852); Gordon v. United States, 2 Wall. (69 U.S.) 561 (1865); In re Sanborn, 148 U.S. 222 (1893) and McGrath v. Kristensen, 340 U.S. 162, 167-68 (1950).

37

To prevent states from altering their voting laws in a way that would interfere with the participation of minorities, the Voting Rights Act of 1965 (VRA) provided that no State could "enact or seek to administer" any change in its election law or practice without obtaining the approval of the U.S. Attorney General or the U.S. District court for the District of Columbia.  The Supreme Court later held this provision of the VRA to apply to state reapportionment and redistricting of voting districts since such legislation could interfere with the purposes of the VRA. Federal courts, when they reject redistricting  plans drawn by state legislatures for failure to adequately protect voting rights, approve and order redistricting plans resulting from litigation before them to protect voting rights.

The question in Connor v. Johnson, 402 U.S. 690 (1971) was whether the order of a federal court approving voting district plans had to be submitted to the Attorney General, or the U.S. District Court for D.C., circumstances not foreseen in the drafting and enactment of the VRA.

The Supreme Court in Connor ruled on the papers before it without oral argument that despite the inclusive language of the VRA, it did not apply to plans ordered by U.S. Courts, thus saving vital civil rights legislation after six years of implementation, and the rule of law and independence of the judiciary

The full force of Hayburn's Case  remains intact after more than two centuries.   Later decisions that federal judges can act as individuals in non judicial matters, but not in their judicial capacity, without impairing the independence of the judiciary, or the integrity of the rule of law, do not affect the principle of the finality of judgments of Article III courts.  See, e.g., Mistretta v. United States, 488 U.S. 361, 397-408(1989) which approved the personal service of three sitting Article III judges on the U.S. Sentencing Commission and reviewed many historical instances of

federal judges serving in many roles as individuals.

Undoubtedly judicial experience is invaluable in many circumstances and judges should not be arbitrarily excluded from contributing their experience and wisdom to projects and activities that will not interfere with their judicial service, or create conflicts of interest..

As noted, some of the Justices who sat in Hayburn's case itself declared their willingness to perform under the Congressional act as commissioners, but not as Article III judges, a gesture that could have weighed heavily on the ability of the individual volunteers to perform their judicial duties if the number of veterans filing claims for pensions proved great.

The very concept of anti-terrorism and sponsorship of terrorism laws may have been good politics, but it is impermissible law when it seeks to involve the Judiciary in foreign policy decisions.  It potentially extends U.S. court jurisdiction wherever on the planet, or elsewhere, U.S. citizens roam placing it in competition, if not conflict, with the jurisdiction of other nations' courts and the constitutional powers vested in the political branches to decide all foreign policy questions.

FSIA §§1605(a)(7) and 1605A require judicial intrusion into the inner sanctums of other nations most secret foreign policies and activities where it will rarely and unreliably be admitted to obtain evidence for determining facts to decide the political questions raised by all such cases.

By the huge awards that Courts have entered, the litigation hast seriously malapportioned resources available to compensate the tragic deaths and repair destruction wrought by terrorism while inflaming passions at its discrimination against the masses of victims who have no remedy. As Justice Scalia observed in Beaty "What would seem perplexing is converting a billion-dollar reconstruction project into a compensation scheme for a few of Saddam's victims." Beaty,, supra at p. 15.  A unanimous Supreme Court has ruled " ... the District Court lost jurisdictiion over both

39

suits in May 2003, when the President exercised his authority to make §1605(a)(7) inapplicable with respect to Iraq.  At that point, immunity kicked in and the cases ought to have been dismissed."  <u>Republic of Iraq</u> v. <u>Beaty</u> op cit. at p. 16.  "When the President exercised his authority to make inapplicable with respect to Iraq all provisions of law that apply to countries that have supported terrorism, the exception to foreign sovereign immunity became inoperative against Iraq". Id. at p.17. 17.

The total failure of legislation involving U.S. courts in cases presenting political questions involved in alleged sponsorship of terrorism by foreign governments under FSIA §§1605(a)(7) and 1605A is manifest in the trail of broken cases that legislation has left behind..

FSIA §§1605(a)(7) and 1605A are unconstitutional because they place highly inflammatory political questions before the judiciary and expose the finality of Article III Court judgments to the political will of the Congress and the President in conducting the foreign relations of the United States.

**V.       The complaint fails to provide the required reasonable connection between the support and resources it alleges in general and conclusory terms Syria furnished to the PKK over the years and the PKK's kidnaping of Wyatt, Wilson and two others in August and September 1991 or similar brief seizures and release of persons by the PKK, and is insufficient to provide the jurisdictional causation that is a necessary element of subject matter jurisdiction under the FSIA's terrorism exception**

No act or conduct or other participation by Syria directly connected to the kidnaping of Wyatt, Wilson and others seized with them and held in August and September 1991 is alleged in the complaint.  Plaintiffs are proceeding entirely on the theory Syria provided continuous extensive general support and resources to the PKK.   And the complaint makes the unlikely, implausible claim that "the PKK could not have abducted plaintiffs" without support from Syria and its agents.

40

¶37, notwithstanding that no high-tech or sophisticated expertise or extensive or complex

equipment or other support was needed for a seizure of this kind.    The allegations of the

complaint are insufficient to establish the connection between support and acts of terrorism

enumerated in FSIA §1605A needed to establish jurisdictional causation as established recently by

the Court of Appeals in <u>Owens</u> v.  <u>Republic of the Sudan,</u>531 F.3d 884 (D.C. Cir. 2008)    <u>Owens</u>

directly addresses the issue of the nature of the connection between support and acts of terrorism

needed to establish jurisdictional causation in cases under the terrorism exception.  <u>Owens</u> arises

from the simultaneous U.S. embassy bombings in Nairobi, Kenya, and Dar es Salaam, Tanzania, on

August 7, 1998.    The District Court originally ruled plaintiffs allegations of support were

insufficient. <u>Owens</u> v. <u>Republic of Sudan</u>, 374 F.Supp.2d 1, 14-16 (DDC 2005)(JDB). Plaintiffs

amended the allegations to include more detail and they were held sufficient by the District Court,

412 F.Supp.2d 99 (2006) and by the Court of Appeals in the decision above cited.. The

allegations judged insufficient by the District Court in <u>Owens</u>, are markedly more direct and

detailed than the allegations in this case.  The Court stated, 374 F.Supp.2d , <u>supra</u> at 15

> . . .the Court concludes that the meaning of "material support" must be alleged with a
> degree of specificity sufficient to determine that they "state a proper claim for [the
> provision of material support or resources] under the FSIA." Price, 294 F.3d at 94.
> The complaint in this case fall short of that standard. Plaintiffs make several
> conclusory allegations that the Sudan defendants provided "cover", "support", and
> "sanctuary" to al Qaeda and Hizbollah, Compl. PP 2, 7, a single allegation that the
> Sudan defendants entered into an unspecified [**38]  agreement with al Qaeda and
> Hizbollah through which those organizations received "shelter and protection from
> interference," id. P 8, and a single allegation that a meeting occurred in the Republic
> of Sudan between the leaders of al Qaeda and Hizbollah to plan the embassy attacks,
> id. These allegations do not provide enough information to determine the nature of
> any relationship between al Qaeda and Hizbollah, the form the alleged acts of
> "support" took, and whether those acts qualify as "material support or resources"
> within the meaning of the statute. The complaint "in its present form is simply too
> conclusory to satisfy § 1605(a)(7)." Price, 294 F.3d at 85

The Court of Appeals in <u>Owens</u> referred to the analysis of but-for causation and proximate

cause in <u>Kilborn,</u>v. <u>Socialist People's Libyan Arab Jamahiriya,</u>376 F.3d 1123 (D.C.Cir. 2004),

rejecting as did <u>Kilburn</u> a but-for causation test, but went beyond <u>Kilburn,</u>, ruling that proximate

cause was also an unsatisfactory measure of jurisdictional causation, and adopting instead the

requirement of a "reasonable enough connection" to meet § 1605(a)(7)'s jurisdictional causation

requirement,.stating, 531 F.3d <u>supra</u> at 895

> "plaintiffs factual allegations and the reasonable inferences that can be drawn
> therefrom show a reasonable enough connection between Sudan's interactions with al
> Qaeda in the early and mid-1990s and the group's attack on the embassies in 1998 to
> meet § 1605(a)(7)'s jurisdictional causation requirement".

Nothing remotely alleging or even suggesting any such  connection is well-pleaded or even

asserted or hinted at in the present kidnapping case.   The complaint's allegations consist almost

entirely of general and conclusory assertions.  Legal conclusions are often couched as facts, as for

example:

> – 41.  The PKK's conduct described herein was caused and facilitated as a direct and
>           proximate  result of the material support and resources provided to the   PKK
>           by Syria and its officials, employees and agents.

> –46.  The harm and injuries suffered by plaintiffs described herein were the direct and
>           proximate result of Syria's conduct.

The allegations of jurisdictional causation that were held sufficient in <u>Kilburn</u> provide much

more of a connection and basis for jurisdictional causation than any of the allegations in the present

case, 376 F.3d at 1129:

> ... we underline that the only issue before us here is jurisdictional
> causation, because §1605(a)(7) is solely a jurisdictional provision.
> Cicippio-Puleo, 353 F.3d at 1032. To succeed in the end, the plaintiff
> must go beyond jurisdiction and provide proof satisfying a substantive

cause of action. Id. ... Whatever the ultimate source may be, it will no
doubt carry with it--as a matter of substantive law--its own rules of
causation. ...

    In this case, there is no doubt that the plaintiff's allegations satisfy
the proximate cause standard. The complaint alleges that, after the
United States bombed  [*1130]  Tripoli, "Libyan agents in Lebanon
made it known that they wanted to purchase an American hostage to
murder in retaliation." Compl. P 13. It specifically asserts that Peter
Kilburn "was purchased and killed by members of the Arab
Revolutionary Cells," id. P 21, "whose acts were funded and directed
by Libya," id. P 26 (emphasis added). A subsequent declaration makes
clear that the plaintiff's allegation is not just that ARC was "supported"
and "funded" by the Libyan government, but that it was "directed" by
that government "and acted as its agent in Lebanon to carry out
terrorist activities, including the purchase and assassination of Peter
Kilburn." Decl. of Ambassador Robert Oakley (Ret.) P 14 (hereinafter
"Oakley Decl."). If proven, these allegations are more than sufficient to
establish that the acts of the Libyan defendants were the proximate
cause of Peter Kilburn's injury and death.


The complaint in <u>Beecham</u> v.Socialist People's Libyan Arab Jamahiriya, 424 F.3d 1109,

1110 (D.C. Cir. 2005) similarly alleges a much clearer connection and jurisdictional causation than

this case:


    Plaintiffs are victims and estate representatives of
victims injured or killed in the 1986 bombing
of the "La Belle" discotheque in West Berlin, Germany. Their
complaint alleges as follows. Defendant [**2]  Colonel Muammar
Al-Ghaddafi, head of the Libyan government, directed Libyan agents
to plan, prepare, and execute the attack. Libyan agent Souad Chraidi
transported plastic explosives, a detonator, and a timing device from
the Libyan embassy in East Berlin to an apartment in West Berlin.
Chraidi and others made the final preparations for the attack, fitting
the detonator and timer to the explosives, which they concealed in a
bag for delivery to the discotheque. On the night of the bombing,
Verena Chanaa and Andrea Hausler brought the bomb to the
discotheque, where they activated the timing device, placed the
bomb at a seat in the center of the dance floor, and left. In the early
morning hours of April 5, 1986, the bomb exploded with
approximately 260 people inside the discotheque. Three people were

killed and more than two hundred injured.

> Among other things, plaintiffs point to telex communications
> between Libyan intelligence in Tripoli and the Libyan embassy in
> East Berlin confirming defendants' responsibility for the attack.
> Colonel Al-Ghaddafi purportedly admitted as much to a German
> ambassador in a meeting in 2001.

The allegations of the complaint in this case are in no way comparable to the allegations in

Owens, Kilburn or Beecham and are inadequate to establish the jurisdictional causation necessary

for subject matter jurisdiction under §1605A or 1605(A)(7).   The lack of subject matter

jurisdiction is apparent on the face of the complaint even if the complaint's extravagant and

speculative allegations are treated as true.

The complaint is uninformatively repetitive in its account of the role fulfilled by  the

Ministry of Defense, Mustafa Tlass and Ghazi Kannan.  Each "routinely provided to the PKK

material support and resources for the commission of terrorist acts and performed actions which

caused injury to the plaintiffs."  ¶ 17, see also ¶¶18 and 19¶

A close and careful reading of the complaint compels the conclusion that plaintiffs know of

no basis for connecting support from Syria to the seizure and holding of Wyatt and Wilson in

August and September 1991 or similar kidnappings by the PKK sufficient to establish jurisdictional

causation under §1605A and that plaintiffs are proceeding without any more knowledge of the

facts and circumstances of the case or basis for informed suppositions about the case than could be

gleaned by a reader of newspaper accounts of the events.  Surely such remote awareness of an

incident provides an insufficient basis for inquiry by attorneys for private plaintiffs in a civil action

into such sensitive subjects as the foreign policies and national security concerns of a sovereign

state.

Plaintiffs make repeated use of the word "specific," undoubtedly seeking to cure the generality of the complaint.   For a few examples, see "specific purpose", ¶¶ 16 and 37; "specific policy" ¶ 31; "specifically in order to cause and facilitate" ¶ 31; and  "specific demands and conditions for release" ¶23.  This rhetorical device should not succeed.   The phrases utilizing the word "specific" are no more meaningful and precise than the words themselves unadorned by "specific."

Syria disagrees with the case law that imposes upon a foreign sovereign the burden of proving its entitlement to immunity,  see e.g. Kilburn, 376 F.3d at 1133, citing Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000).  A rule followed in all cases, that is not limited to cases under the terrorism exception.   We have found  no U.S. Supreme Court decision  that so holds, a holding that is particularly unlikely in a case like this one, where there is no question the defendant is a foreign state for purposes of the FSIA,  and the statutory criteria for loss of something as crucial to Syria as its immunity in the courts of what is regrettably, but unquestionably, an unfriendly government, purporting to apply in its Courts  laws that are now even more arbitrary, hostile, unfair and draconian under FSIA § 1605A than they were under FSIA §1605(a)(7).

### Conclusion

Syria's motion under Rule 12(b) should be granted, and this case dismissed

Dated: New York, NY
      November 24, 2009

Respectfully submitted,
/s/
Ramsey Clark DC Bar No. 73833
/s/
Lawrence W. Schilling
37 W. 12 th St.
New York, NY 10011
212-989-6613 fax 212-979-1583
lwschilling@earthlink.net
Attorneys for the Syrian Arab Republic