**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MARY NELL WYATT, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil No. 08–502 (RCL) |
| | ) |
| SYRIAN ARAB REPUBLIC, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.    INTRODUCTION

Marvin T. Wilson and Ronald Wyatt were abducted and held hostage in Turkey for twenty-one days by terrorists belonging to the Kurdistan Workers Party ("PKK").  This action was brought by Mr. Wilson, Mr. Wyatt's estate, and members of both of their families against the Syrian Arab Republic ("Syria") pursuant to the updated state-sponsored terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.   For reasons given below, the Court now enters final judgment against Syria, and orders that it pay plaintiffs $338,000,000, distributed among plaintiffs as described below.

## II.    PROCEDURAL HISTORY

Plaintiffs first filed an action in 2001 under the former state-sponsored terrorism exception, codified at 28 U.S.C. § 1605(a)(7).  *See Wyatt v. Syrian Arab Republic*, 01–cv–1628. Congress subsequently repealed the former state-sponsored terrorism exception, and replaced it with an updated version, codified at 28 U.S.C. § 1605A.  After the statutory update, plaintiffs filed the present action to take advantage of the terms contained in the new provision.  To avoid

needlessly duplicative litigation, the Court dismissed the initial action. *See Wyatt*, 01–cv–1628, ECF No. 98. Process was served on Syria via diplomatic channels pursuant to § 1608(a)(4).[1] ECF No. 12. Judge Urbina[2] denied Syria's motion to dismiss for lack of jurisdiction. *Wyatt v. Syrian Arab Republic*, 736 F. Supp. 2d 106 (D.D.C. 2010). Syria did not file an answer within fourteen days. *See* Order, July 2, 2012, ECF No. 29 (noting that Syria's attorney "advised the Court that Syria . . . will appear to contest jurisdiction but otherwise [will] have no further participation in this case."). The Clerk subsequently entered default against Syria. ECF No. 31.

## III.   FINDINGS OF FACT

Under the FSIA, a court cannot simply enter default judgment; rather, it must ensure that the plaintiffs have established their claim or right to relief by evidence that is satisfactory to the court. 28 U.S.C. § 1608(e); *see also Botvin v. Islamic Republic of Iran*, 2012 WL 2552475 at *2 (D.D.C. July 3, 2012). Accordingly, courts must scrutinize the plaintiffs' allegations, and may not simply accept a complaint's unsupported allegations as true. *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010). Courts may rely upon testimony, documentation and affidavits. *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 53 (D.D.C. 2006).

Plaintiffs have "establishe[d] [their] claim or right to relief by evidence that is satisfactory to the Court" as required by 28 U.S.C. § 1608(e). The following facts have been established by clear and convincing evidence which would have been sufficient to establish a prima facie case in a contested proceeding:

---

[1] Plaintiffs had also named PKK as a defendant, but the Court dismissed PKK from the case because plaintiffs failed to serve them with process. *See* Order, May 17, 2012, ECF No. 27.

[2] The case was reassigned to the undersigned judge upon Judge Urbina's retirement from the bench. *See* Minute Order, Apr. 25, 2012.

A.      **The Parties**

1.  Plaintiff Marvin T. Wilson, the first hostage, is an American citizen. Decl. Pl. Marvin T. Wilson ("Marvin Wilson Decl.") ¶ 1, ECF No. 34–1; United States Passport and Birth Certificate of Marvin Thomas Wilson.[3]

2.  Plaintiff Ronald Wyatt, the second hostage, died in 1999 of cancer and thus did not participate in this case.  Decl. Pl. Mary Nell Wyatt ("Mary Wyatt Decl.") ¶¶ 3, 14, ECF No. 34–3. He was an American citizen.  *See* Passport of Ronald Eldon Wyatt, ECF No. 36–1.

3.  Plaintiff Renetta Wilson is the wife of Marvin Wilson, and was married to him when he was abducted.  Decl. Pl. Renetta T. Wilson  ("Renetta Wilson Decl.") ¶ 2, ECF No. 34–2. She is an American citizen. Passport and Birth Certificate of Renetta T. Wilson.[4]

4.  Plaintiff Kimi Lynn Wilson Johns is a daughter of Marvin Wilson.  Decl. Pl. Kimi Johns ("Johns Decl.") ¶ 3, ECF No. 34–7. She is an American citizen.  Birth Certificate of Kimi Lynn Wilson.[5]

5.  Plaintiff Marty R. Wilson is a son of Marvin Wilson.  Decl. Pl. Marty R. Wilson ("Marty Wilson Decl.") ¶ 2, ECF No. 34–8.  He is an American citizen.  Passport of Marty Ray Wilson, Ex. 13, ECF No. 34.

6.  Plaintiff Gina Wilson is another daughter of Marvin Wilson.  Decl. Pl. Gina Wilson ("Gina Wilson Decl.") ¶ 2, ECF No. 34–9.  She is an American citizen.  Passport and Birth Certificate of Gina Ranae Wilson.[6]

---

[3] Copies of Marvin Wilson's passport and birth certificate were submitted to the Court, as indicated on the exhibit list, *see* Ex. 6, ECF No. 32, though the copies themselves do not appear on ECF.

[4] Copies of Renetta Wilson's passport and birth certificate were submitted to the Court, as indicated on the exhibit list, *see* Ex. 7, ECF No. 32, though these copies themselves do not appear on ECF.

[5] A copy of Kimi Wilson's birth certificate was submitted to the Court, as indicated on the exhibit list, *see* Ex. 3, ECF No. 32, though the copy itself does not appear on ECF.

[6] Copies of Gina Wilson's passport and birth certificate were submitted to the Court, as indicated on the exhibit list, *see* Ex. 5, ECF No. 32, though these copies themselves do not appear on ECF.

7.  Plaintiff Bradley Key is a stepson of Marvin Wilson.  Decl. Pl. Bradley Key ("Bradley Key Decl.") ¶ 2, ECF No. 34–10.  He is an American citizen. Birth Certificate of Bradley Grant Key.[7]

8.  Plaintiff Barry Key is another stepson of Marvin Wilson.  Decl. Pl. Barry Key ("Barry Key Decl.") ¶ 2, ECF No. 34–11. He is an American citizen. Passport and Birth Certificate of Barry Todd Key.[8]

9.  Plaintiff Mary Nell Wyatt was married to Ronald Wyatt from 1988 until his death in 1999.  Mary Wyatt Decl. ¶ 3.  She is an American citizen, Passport of Mary Nell Lee,[9] and sues both as a family member plaintiff as well as executrix of Ronald's estate.

10.  Plaintiff Amanda Lippelt is the step-daughter of Ronald Wyatt.  Decl. Pl. Amanda Lippelt ("Lippelt Decl.") ¶ 3, ECF No. 34–4. She is an American citizen. Birth Certificate of Amanda Lippelt, Ex. 12, ECF No. 34.

11.  Plaintiff Michelle Wyatt Schelles is the daughter of Ronald Wyatt.  Decl. Pl. Michelle Wyatt Schelles ("Schelles Decl.") ¶ 3, ECF No. 34–5. She is an American citizen. Passport of Michelle Wyatt Schelles.[10]

12.  Plaintiff Daniel Keith Wyatt is the son of Ronald Wyatt.  Decl. Pl. Daniel Keith Wyatt ("Daniel Wyatt Decl.") ¶ 3, ECF No. 34–6. He is an American citizen. Passport of Daniel Keith Wyatt, Ex. 14, ECF No. 34.

---

[7] A copy of Bradley Key's birth certificate was submitted to the Court, as indicated on the exhibit list, *see* Ex. 8, ECF No. 32, though the copy itself does not appear on ECF.

[8] Copies of Barry Key's passport and birth certificate were submitted to the Court, as indicated on the exhibit list, *see* Ex. 2, ECF No. 32, though the copies themselves do not appear on ECF.

[9] A copy of Mary Nell Lee's passport was submitted to the Court, as indicated on the exhibit list, *see* Ex. 1, ECF No. 32, though the copy itself does not appear on ECF.

[10] A copy of Michelle Wyatt Schelles' passport was submitted to the Court, as indicated on the exhibit list, *see* Ex. 4, ECF No. 32, though the copy itself does not appear on ECF.

**B.      The Kidnapping**

13.   In August 1991, Marvin Wilson and Ronald Wyatt were driving with a guide and several others towards a possible archeological site[11] in the mountains of Ararat in Turkey when they came across a commercial passenger bus stopped on the road. Marvin Wilson Decl. ¶ 6. After they stopped their vehicle, several gunmen—who the victims later learned were PKK terrorists—"came running" from the stopped bus towards them, "yelling and screaming, and pointing their weapons at [them]." *Id.*  After their guide informed the gunmen that Mr. Wilson and Mr. Wyatt were Americans, the gunmen took the two men captive at gunpoint along with their American and English companions. *Id.* ¶ 7.  The gunmen allowed the non-Western travelers, including the guide, to go free. *Id.*  The gunmen "kept yelling and screaming" at their captives in "Turkish or Kurdish," and then began "pushing [them] around and roughing [them] up." *Id.* ¶ 8.

14.   The gunmen ordered Mr. Wilson to change out of the light clothes he was wearing into darker clothes in order to become "less visible to Turkish troops that would eventually be searching for [them]." *Id.* ¶ 9.

15.   The men were marched at gunpoint through the "Turkish wilderness" through the night. *Id.* ¶¶ 9–10.  Mr. Wilson, who "grew up hunting in the wilderness," *Id.* ¶ 10, estimates that they covered "at least 25 miles, though it may have been more." *Id.* ¶ 11.  He remembers the march as "torturous" and "extremely arduous," and, because of the "icy winds and the night-time cold biting through [his] soaking wet clothes," he "feared [they] were facing hypothermia." *Id.* ¶

---

[11] The men were "research[ing] a location where [they] believed remnants of the biblical Noah's Ark resides." Marvin Wilson Decl. ¶ 5.  Mr. Wilson states that the men had "secured the permission of the Turkish government to excavate in this area and . . . had received a guaranty from a British aerospace company for the funding of this historic project." *Id.*

10.  The men were prohibited from speaking with each other throughout the night. *Id.* ¶ 11.  They were allowed to sleep in the morning with "no cover" in the "freezing cold." *Id.* ¶¶ 11–12.

16.  For several days that followed, the men were moved only at night, allowed to rest during the day, and were prohibited from talking with each other—although this last rule was subsequently relaxed. *Id.* ¶¶ 12–13.  During these first days, the men were given "only a little bit of cheese to eat and then eventually some vegetables too." *Id.* ¶ 13.  Moreover, the men were prohibited from attending to any personal needs without first obtaining permission from their armed captors, and were constantly monitored by them. *Id.*  While in custody, Mr. Wilson lost a significant amount of weight. *Id.* The terrorists carried many weapons and told the men that if they tried to escape, the "Turks would find [them] and kill [them] so that they could blame the PKK for [their] deaths." *Id.* ¶ 14.

17.  When the men heard helicopters in the area, the gunmen lined their captives up in a row and pointed guns at them as though they were going to execute them. *Id.* ¶ 17.  Mr. Wilson stated that the terrorists did this to prevent them from attempting to escape. *Id.*

18.  The men were marched "high up in the mountains." *Id.* ¶ 18.  Mr. Wilson recalls that although it was "extremely cold," the prisoners were not given "anything to insulate [them] from the frigid weather." *Id.* ¶ 18.  He recalls that the terrorists "would keep saying that they were going to release [them], and yet the days of [their] captivity dragged on endlessly." *Id.* ¶ 22.

19.  The terrorists also tried to indoctrinate their captives, showing them "pictures of people being killed," telling them how "the Americans and Turks were killing innocent civilians," talking to them about Kurdish history, and discussing the "PKK manifesto." *Id.* ¶ 19.

20.   Nearly three weeks after they had been abducted, the prisoners were marched overnight to an encampment of other PKK guerillas near a small town. *Id.* ¶ 23. The following night, the prisoners were packed into a small car with a driver. *Id.* During the ensuing drive, Mr. Wyatt tried to "attack" the driver so that the prisoners could escape, but the effort failed and, as Mr. Wilson recalls, "almost caused a horrible accident." *Id.* ¶ 24. After several hours, the driver dropped the prisoners back where they had been abducted. *Id.* The men wandered until they found some Turkish soldiers who took them to military headquarters, and ultimately handed them over to the United States Department of State and, after lengthy interrogation, they were finally returned back home. *Id.* ¶¶ 24–27.

21.   Altogether, the men were held hostage by the PKK for 21 days. *Id.* ¶ 21. Mr. Wilson recalls that the men feared for their lives throughout this period. *Id.* ¶¶ 16–17, 20–21.

## C.   The PKK

22.   The Kurdistan Workers' Party, or PKK, was founded in the late 1970s to bring about the establishment of an independent Kurdish state through acts of violence and terrorism, often directed at civilians. *See* Expert Report of Dr. Matthew Levitt ("Levitt Report");[12] Expert Report of Dr. Soner Cagaptay 2 ("Cagaptay Report");[13] Testimony of Dr. Soner Cagaptay ("Cagaptay Testimony"), Evidentiary Hearing, Aug. 21, 2012. The organization is based in Turkey, but maintained a presence and operated in Syria during the time of the Wilson and Wyatt kidnapping. *See* Levitt Report. In addition to kidnappings, which are a "standard PKK tactic," PKK terrorists have also engaged in guerilla assaults on military targets, suicide bombings in

---

[12] A copy of Dr. Levitt's (unpaginated) report was filed with the Court, as indicated on the exhibit list, *See* Ex. 10, ECF No. 32, though the report itself does not appear on ECF. Dr. Levitt was accepted as an expert witness on the PKK by this Court at the August 21, 2012 Evidentiary Hearing.

[13] A copy of Dr. Cagaptay's report was filed with the Court, as indicated on the exhibit list, *See* Ex. 11, ECF No. 32, though the report itself does not appear on ECF. Dr. Cagaptay was accepted as an expert witness on the PKK by this Court at the August 21, 2012 Evidentiary Hearing.

civilian-dense urban areas, drug trafficking, robbery, and extortion.   Cagaptay Report 3–4; Cagaptay Testimony; *see also* Levitt Report.

### D.    Syria's Support of the PKK

23.    Syria supported PKK activities during the years immediately preceding the kidnapping by hosting PKK training facilities on its territory, providing shelter for PKK's leader, Abdullah Ocalan, and facilitating various forms of material support to the group including weapons, safehouses, training facilities and more.   Cagaptay Report 5; Levitt Report; Report of Dr. Marius Deeb ("Deeb Report");[14] Cagaptay Testimony.

24.   Dr. Marius Deeb testified that 95% of PKK's funding during this period came from the Syrian government, an estimated $10 million per year—a figure that excludes the provision of other forms of material support, such as safe houses, land, and weapons. Testimony of Marius Deeb ("Deeb Testimony"), Evidentiary Hearing, Aug. 21, 2012. Dr. Levitt testified that the PKK would not have been able to conduct its operations without Syrian Support.   Testimony of Dr. Matthew Levitt ("Levitt Testimony"), Evidentiary Hearing, Aug. 21, 2012.

25.   Plaintiffs' experts emphasized that the PKK's activities along the Syrian-Turkish border during the period when the kidnapping occurred would have been impossible without the approval and support of the top leadership of the Syrian government, and concluded that the operations conducted by the PKK in this region was done with full knowledge and support of the leadership of the Syrian regime.   Deeb Report; Deeb Testimony; Cagaptay Testimony.

26.   Plaintiffs' experts pointed to a variety of sources to support the close relationship between Syria and PKK during this period, including U.S. State Department reports, Turkish government reports, other reports from NGOs and academics, newspaper reports, testimony from

---

[14] A copy of Dr. Deeb's (unpaginated) report was filed with the Court, as indicated on the exhibit list, *See* Ex. 9, ECF No. 32, though the report itself does not appear on ECF. Dr. Deeb was accepted as an expert witness on the PKK by this Court at the August 21, 2012 Evidentiary Hearing.

former PKK members who either defected or were captured by the Turkish government, and several agreements between Syria and Turkey in which Syria tacitly acknowledged its connection to the PKK.  Levitt Report; Cagaptay Report; Cagaptay Testimony.

27.  Syria is a foreign state and has been designated a state sponsor of terrorism pursuant to 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j) continuously since 1979. U.S. Dep't of State, State Sponsors of Terrorism, http://www.state.gov/j/ct/list/c14151.htm.

### E.      Injuries of Hostage Plaintiffs

28.  Plaintiff Marvin Wilson remembers being "fearful" that he would be murdered on the spot when the terrorists first approached.  Marvin Wilson Decl. ¶ 6.  He was "terrified" and had "no idea what was happening or why [he] was being taken hostage."  *Id.* ¶ 8.  He was "horrified" and "completely at [the] mercy" of the terrorists.  *Id.*  After the forced march began, Mr. Wilson remembers "thinking that perhaps this was a horrible dream of some kind" because he "just couldn't fathom that [he] had suddenly been taken captive by armed guerillas."  *Id.* ¶ 9. He became "panicked" and "worried about what [his] family would go through if [he] disappeared and never returned."  *Id.* ¶ 10.  He recalls that the PKK gunmen "looked like they wanted to murder [the prisoners] always with ruthless glares and stern presence."  *Id.* ¶ 16. When one of his fellow captives became injured and the PKK gunmen refused to provide assistance, Mr. Wilson remembers thinking that "this was the end—that any moment one of the terrorists would unload one of their clips of ammunition into [him]."  *Id.* ¶ 20.  He says that the prisoners "understood that [their] lives meant very little to these hardened guerillas."  *Id.* ¶ 21. During the entire ordeal, he says, "[he] did not know whether [he] was going to live or be

murdered at any time.  Being under the constant threat of death and having loaded weapons pointed at me all the time was extremely gruesome." *Id.* ¶ 28.[15]

29.   The kidnapping had lasting emotional and psychological effects on Mr. Wilson. Even now, "so many years later," he says that "the pain fear, and anxiety that [he] experienced still seems so fresh to [him]," and that "[t]he trauma of being a hostage is something [he] carr[ies] with [him] all the time." *Id.* ¶ 28.  He states that he remained worried "that there may be reprisals against [him] or [his] family from people affiliated with the PKK," and that he remains "nervous" about "a PKK loyalist someday showing up at [his] door seeking revenge against [him]." *Id.* ¶ 30.  While Mr. Wilson has returned to Turkey since the kidnapping, he states that he "will never travel at night anymore, especially in the Kurdish areas." *Id.* ¶ 32.  His wife, Renetta, states that, although he was not a "drastically changed man" after the incident, Mr. Wilson was "very disappointed and depressed" about the failure of the archeological project that had been the basis for his trip to Turkey.  Renetta Wilson Decl. ¶¶ 17, 19.

30.   The kidnapping had lasting effects on Mr. Wyatt as well.  According to the affidavit testimony of his widow, Mary Wyatt, Ron returned home in "relatively bad shape" as "his leg had been badly injured during the abduction."  Mary Wyatt Decl. ¶ 11.  Mr. Wyatt "never fully recovered from this injury" and "[f]rom that time he always walked with a a limp and after a few years, he often needed the assistance of a cane to get around." *Id.*  In addition, according to his widow, Mr. Wyatt's "demeanor changed for the worse in a significant way after the abduction" and he "seemed to be preoccupied all the time" and to have "lots of pent up anger." *Id.* ¶ 12.  He was "anxious" and "under tremendous stress." *Id.*

---

[15] Mr. Wyatt is deceased and cannot provide testimony as to his mental state during the kidnapping.  Mr. Wilson's subjective recollections cannot be taken as Mr. Wyatt's.  However, Mr. Wilson's recollections as to the physical and psychological abuse given by the PKK terrorists to all of their prisoners, including Mr. Wyatt, will apply to Mr. Wyatt, and allows this Court to infer the Mr. Wyatt was similarly made to fear for his life.

**F.    Injuries of Family Member Plaintiffs**

31.    The kidnapping also caused severe emotional distress to the kidnapped men's two spouses and eight of their children.  Renetta Wilson, Marvin Wilson's wife, remembers being "frantic[]" when she first learned that her husband had been captured.  Renetta Wilson Decl. ¶ 7. She was "stunned and upset" when she received what she describes as an "impersonal . . . form letter" from the U.S. Department of State explaining how they handle deaths of U.S. civilians abroad.  *Id.* ¶ 9.  This letter caused her "much distress, was a real blow to [her] hopes" and "plunged [her] into a deep state of anxiety and fear . . . ." *Id.*  She describes her "overall state of mind" during the period of the kidnapping as "very confusing and distressed," and explains that she was "suffering from the agonizing uncertainty of not knowing whether [her] husband was dead or alive." *Id.* ¶ 11. She remembers having "difficulty keeping [her]self composed and ha[ving] trouble being strong for [her children]."  *Id.* ¶ 12.  She grew "deeply exhausted and overwhelmed." *Id.*  Four of her five children joined her at her home during this period, and their relationships with one another became tense as a result of the kidnapping, which created more anxiety for Renetta. *Id.* ¶¶ 12–15.

32.    Kimi Johns, Marvin Wilson's daughter, also suffered emotional and psychological harms as a result of her father's kidnapping. *See* Johns Decl. ¶¶ 4–11.  She remembers feeling "completely distraught" after hearing her father had been kidnapped. *Id.* ¶ 6.  Her fear that "any moment the phone could ring with horrible news" led her to sometimes "just lose it and sit down into cry." *Id.* She recalls being "constantly upset and crying" and feeling "an overwhelming sense of gloom come over [her] family." *Id.*  Ms. Johns further states that during this period she "could not sleep and was very fatigued." *Id.* ¶ 7.  And, the effects continued after her father returned home—she complains of "recurring nightmares," and bouts of crippling paranoia

regarding her family's safety, a fear of travel, an inability to watch movies about kidnapping or terrorism or even the news "because [she] fear[s] that a scary picture will pop up on the screen that will trigger these horrible memories." *Id.* ¶ 11.

33. Marty Wilson, the son of Marvin, also suffered severe emotional distress as a result of his father's kidnapping. *See* Marty Wilson Decl. ¶¶ 6–11. He remembers feeling a "great deal of stress and frustration" created by the "horrifying" uncertainty of knowing whether his father was alive. *Id.* ¶ 6. He says that "[e]veryone was experiencing deep feelings of despair." *Id.* He remembers that it became "extremely difficult to concentrate on [his] work," that he had trouble sleeping, and the experience took a "severe physical toll" on him. *Id.* ¶ 7. He recalls the whole experience as "a tremendously stressful and painful time" and states that he feels as though he "aged a lot of years" during that period. *Id.* ¶ 8. This "traumatic" experience affected him long after his father returned: he states that the "feelings of anger and frustration continue until today." *Id.* ¶ 11.

34. Gina Wilson, another daughter of Marvin, also suffered severe emotional distress as a result of her father's kidnapping. *See* Gina Wilson Decl. ¶¶ 3–13. When she heard that her father might have been abducted, her "heart stopped" and she was "completely shocked and horrified." *Id.* ¶ 3. She went to her parents' house, where she recalls the atmosphere was "crazy," with everyone "breaking down with fear and terrifying thoughts." *Id.* ¶ 5. She states that her father's captivity was all she could think about, and she could not "concentrate on taking care of [her] child because [she] was so distraught and distracted." *Id.* ¶ 6. She remembers this period as "one long painful blur of depression and anxiety," and says that it was the "most anguished period of my life." *Id.* ¶¶ 6–7. She returned home, but found that she "could not concentrate on anything because the kidnapping was always foremost on [her] mind." *Id.* ¶ 8.

She was "unable to sleep or even rest" and describes the ensuing fatigue as "debilitating." *Id.* After her father's safe return, she continued to feel the effects of his abduction. She notes that she felt anxious about being attacked in the United States, became fearful whenever her parents traveled again, and herself has not been able to travel abroad since this incident. *Id.* ¶¶ 12–13.

35.   Bradley Key, Marvin Wilson's stepson, also suffered severe emotional distress as a result of his stepfather's kidnapping. *See* Bradley Key Decl. ¶¶ 4–13. His initial reaction to learning of what had happened to his stepfather was "shock and disbelief." *Id.* ¶ 5. He recalls being "paralyzed with fear" and describes the experience as "very traumatic." *Id.* As soon as he learned about the abduction, he "was so distraught that [he] drove straight to [his] parents' house" to be with his family. *Id.* ¶ 6 He remembers that he "didn't sleep for days and grew miserable and completely exhausted." *Id.* ¶ 7. Although the family "usually all get along really well," several quarrels and conflicts broke out between the family members who were gathered there as a result of the "incredibly stressful, tense situation." *Id.* After a few days of this, Bradley states that he "felt as if everything was starting to unravel." *Id.* ¶ 9. He refers to the period of his stepfather's kidnapping as "three of the longest and most wretched weeks of [his] life." *Id.* ¶ 10. He also feels lingering effects of this kidnapping, stating that he became "a more nervous person than [he] used to be," and expresses anxiety about future PKK attacks on his family. *Id.* ¶¶ 12–13.

36. Barry Key, Marvin Wilson's other stepson, also suffered severe emotional distress as a result of his stepfather's kidnapping. *See* Barry Key Decl. ¶¶ 4–10. When he learned of the kidnapping, he recalls feeling "completely stunned" and then "very concerned for [his] mother. *Id.* ¶¶ 4–5. He states that his whole family was "in shock and deeply afraid," that they were "very traumatized" and "horrified with thoughts that he was being physically abused or tortured

by the terrorists." *Id.* ¶ 6.   He found it "very hard to sleep" because of the "feeling of constant exhaustion and anxiety." *Id.* ¶ 8.   He felt "deeply anguished and under tremendous pressure" throughout the period of his stepfather's kidnapping. *Id.* ¶ 10.   Years later, he continues to feel "a real sense of fear and unease" as a result of these events. *Id.*

37.   Mary Wyatt, Ronald Wyatt's widow, also suffered severe emotional distress as a result of her late husband's kidnapping. *See* Mary Wyatt Decl. ¶¶ 5–14.   She states that she "can never forget the morning of August 31, 1991" when she was "woken by a ringing phone," and soon learned that her husband had been kidnapped. *Id.* ¶ 5.   She quickly became "frantic" and "panicked," and remembers feeling "helpless." *Id.* ¶ 6.   She was "terrified" that she would not see her husband again.   *Id.*   After speaking with the State Department, and still without any information about her husband, she "completely broke down and could barely function." *Id.* ¶¶ 8–9.   She remembers that "the thoughts of [her husband's] never returning to [her] scared [her] beyond belief." *Id.* ¶ 10.   She "fell into a very deep depression," "could not sleep" and suffered "overwhelming anguish."   *Id.*   Even after her husband returned, she suffered lingering effects. He continued to be very anxious, which caused "significant tension" between them. *Id.* ¶ 12. Also, her daughter Amanda left the home as a result of the stress of living with Ron after he returned, and this caused Mary to experience "anger, frustration and depression." *Id.* ¶ 14.

38.   Amanda Lippelt, Ronald Wyatt's stepdaughter, also suffered severe emotional distress as a result of her late stepfather's kidnapping. *See* Lippelt Decl. ¶¶ 3–15.   She describes the abduction as "a very intense and scarring experience" which "significantly impacted [her] life negatively in many ways." *Id.* ¶ 4.   She remembers the "uncertainty of whether [she] would ever see [her stepfather] again" was "overwhelming," "traumatic" and "life-changing." *Id.*   She says that it was "excruciatingly painful not to know whether [her] stepfather was dead or alive,"

and describes feeling as though she were "stuck in an abyss" without knowing "how or if [she] would be able to climb out." *Id.* ¶ 5.  She recalls that during the entire period of her stepfather's captivity, she could not sleep, or "concentrate on anything, especially [her] schoolwork." *Id.* ¶ 6. She also states that it was "extremely hard" to watch her mother go through "the traumatic experience of thinking she lost her husband." *Id.* ¶ 7.  After her stepfather returned home, Ms. Lippelt states that the "once care-free and loving atmosphere in [their] home" had changed because Ron was "very upset, angry and tense." *Id.* ¶ 9.  She also states that she became "very nervous" about her safety, anxious that terrorists would attack her family, and ultimately decided to move out of this home and instead live with her biological father, who lived far from her mother and Ron. *Id.* ¶ 11.  She states that, with the exception of a single trip to Europe, she no longer travels abroad because she cannot feel safe doing this. *Id.* ¶ 14.

39.  Michelle Wyatt Schelles, Ronald Wyatt's daughter, also suffered severe emotional distress as a result of her late father's kidnapping. Schelles Decl. ¶¶ 5–13.  She remembers feeling "terrorized and completely at a loss" when learning of her father's kidnapping. *Id.* ¶ 5. She had a "constant fear" that her father would be killed, and states that it was "agonizing to just sit and wait for news." *Id.* ¶ 6.  She recalls that, because no other information was available, she "kept thinking about worst-case scenarios," imagining her father being "treated cruelly—beaten, interrogated and tortured." *Id.* ¶ 8.  She states that she also could not sleep at night, and became "exhausted and depressed." *Id.* ¶ 9.  After her father's safe return, she continued feeling "nervous" whenever he would travel. *Id.* ¶ 12.

40.  Daniel Keith Wyatt, Ronald Wyatt's son, also suffered severe emotional distress as a result of his late father's kidnapping.  *See* Daniel Wyatt Decl. ¶¶ 3–8.  Daniel states that upon learning of his father's abduction, he first felt "guilty" that he had not accompanied his father on

this trip. *Id.* ¶ 4. He was "afraid for his [father's] life" throughout the period of captivity. *Id.*

Later, because he received no information about his father's whereabouts, he felt more and more

"anxiety, frustration and fear." *Id.* After his father's safe return, he felt "angry" about what his

captors had done to him. *Id.* ¶ 5. The abduction also created a rift between Daniel and his

brother Ronnie Jr. which continues to this day. *Id.* ¶ 8.

## IV.   CONCLUSIONS OF LAW

Based on these findings of fact, the Court reaches the following conclusions of law.

### A.  Jurisdiction and Sovereign Immunity[16]

The FSIA provides immunity to foreign states from suit and denies United States courts

jurisdiction over such actions. 28 U.S.C. § 1604. However, under certain circumstances, courts

obtain original jurisdiction for suits against foreign states, and the sovereign immunity of those

states can be waived. Based on the evidence presented by plaintiffs here, these conditions have

been met.

The state-sponsored terrorism exception provides that federal courts possess original

jurisdiction over suits against a foreign state if (1) money damages are sought, (2) against a

foreign state for (3) personal injury or death that (4) was caused (5) by an act of hostage taking,

or the provision of material support or resources for such an act. 28 U.S.C. § 1605A(a)(1); *see

also Oveissi v. Islamic Republic of Iran*, 11-cv-1989, 2012 WL 3024758 at *4 (D.D.C. July 25,

2012). The state-sponsored terrorism exception provides that a waiver of a foreign state's

sovereign immunity occurs where (6) the foreign state was designated as a state sponsor of

terrorism at the time of the act and remains so designated when the claim is filed, (7) the

---

[16] In a September 8, 2010 Opinion in this action, Judge Urbina rejected Syria's motion to dismiss plaintiffs' § 1605A claims for lack of subject matter jurisdiction. *See Wyatt v. Syrian Arab Republic*, 736 F. Supp. 2d 106, 111 (D.D.C. 2010). In order to provide a complete jurisdictional analysis this Opinion cannot avoid retreading some of the ground covered previously by Judge Urbina.

claimant or the victim was, at the time of the act a national of the United States and (8) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim."   28 U.S.C. § 1605A(a)(2)(A)(i)–(iii).  Here, all eight of these prerequisites are met.

*First*, plaintiffs' complaint seeks "money damages."  *See* Compl. at 17, ECF No. 3.

*Second*, Syria is a foreign state.

*Third*, the Complaint contains claims arising out of Syria's provision of material support to a terrorist organization responsible for the kidnapping of Marvin Wilson and Ronald Wyatt which resulted in "personal injury" to both men.[17]  *See supra* ¶¶ 28–30.

*Fourth and fifth*, plaintiffs' evidence establishes that Syria provided material support for PKK's terrorist activities for the purpose of undertaking attacks such as the 1991 hostage taking of Marvin Wilson and Ronald Wyatt.  *See supra* ¶¶ 23–27.  Section 1605A(h)(3) defines "material support or resources" as having the same meaning as in 18 U.S.C. § 2339A, which defines it to include

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

Here, plaintiffs' evidence, reviewed above, shows that Syria provided a variety of forms of material support to the PKK, including: (1) weapons and ammunition; (2) financial assistance; (3) safe haven and shelter in Syria to PKK leadership; and (4) terrorist training by members of

---

[17] As discussed below in greater detail, Mary Wyatt suggests that her husband Ron's death from cancer is traceable to this kidnapping, but the Court rejects this theory because plaintiffs have not provided adequate evidence in support of it. But this does not affect the jurisdictional analysis.  Because plaintiffs have adequately proven that defendant's actions caused "personal injury" to Mr. Wyatt and Mr. Wilson they need not go show that the same actions caused Mr. Wyatt's death in order to obtain this Court's jurisdiction.

the Syrian armed forces and intelligence agencies. *See supra* ¶¶ 23–27.  This support falls

squarely within the definition of "material support or resources" in 18 U.S.C. § 2339A, and by

extension, 28 U.S.C. § 1605A.

As to "causation," as Judge Urbina held in an earlier opinion in this case, "[t]o establish

jurisdiction under the terrorism exception to the FSIA, the plaintiffs 'need not establish that the

material support or resources provided by [Syria] for terrorist acts contributed directly' to the

hostage-taking." *Wyatt*, 736 F. Supp. 2d at 112 (quoting *Kilburn v. Islamic Republic of Iran*, 699

F. Supp. 2d 136, 153 (D.D.C. 2010).  Rather, "the plaintiffs must 'alleg[e] facts sufficient to

establish a reasonable connection between a country's provision of material support to a terrorist

organization and the damage arising out of a terrorist attack.'" *Id.* (quoting *Rux v. Republic of

Sudan*, 461 F.3d 461, 473 (4th Cir. 2006) (citing *Kilburn v. Socialist People's Libyan Arab

Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004))).  Plaintiffs' evidence, demonstrates such a

"reasonable connection" between Syria's material support of PKK and the kidnapping by

showing that Syria bankrolled, armed, and otherwise supported the organization with full

knowledge of the violent tactics the group employed. *See supra* ¶¶ 23–26.

Plaintiffs' injuries must also have a "reasonable connection" to Syria's material support

of the PKK in order to support jurisdiction.  Plaintiffs assert four types of injuries: (a) physical

and psychological injuries to the hostage plaintiffs during and after their kidnapping; (b)

emotional distress caused to the family member plaintiffs during and after the kidnapping; (c) the

subsequent death of Ronald Wyatt; and (d) economic losses to the hostage plaintiffs.

As to (a), the physical and psychological injuries suffered by Ronald Wyatt and Marvin

Wilson during the kidnapping which endured for long after the kidnapping was over plainly have

a reasonable connection to Syria's material support of the PKK.   These injuries are direct

consequences of the abuse these men were subjected to at the hands of the PKK—an organization armed, funded and otherwise supported by Syria. *See supra* ¶¶ 23–30.

As to (b), courts have set forth the following standard for emotional distress claims under FSIA's state-sponsored terrorism exemption: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (citing Restatement (Second) of Torts § 46(1)). The scope of recovery for these harms is limited to "member[s] of [the injured person's] immediate family." *Fain*, 856 F. Supp. 2d at 123–24 (quoting Restatement (Second) of Torts § 46(2)(a)–(b)). Physical presence at the place of the outrageous conduct is not required. *See Bodoff v. Islamic Republic of Iran*, 08-cv-547, 2012 WL 5995690 at *9 (D.D.C. Dec. 3, 2012) (*Bodoff II*) (citing *Heiser*, 659 F. Supp. 2d at 26–27; Restatement (Second) of Torts § 46).

Here, this test is satisfied. "First, a terrorist attack constitutes extreme and outrageous conduct." *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 85 (D.D.C. 2006) (*Bodoff I*) (citing *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)). Second, by bankrolling and otherwise supporting a terrorist organization responsible for the kidnapping Marvin Wilson and Ronald Wyatt, Syria did act recklessly to cause severe emotional distress to their family members. Third, each of the family member plaintiffs suffered severe emotional distress as a result of this kidnapping, which they state in detail in affidavits submitted to this court. *See supra* ¶¶ 31–40. Fourth, all of the family member plaintiffs are either spouses or children of the kidnapping victims and thus fall into the definition of "immediate family." *See*

*Fain*, 856 F. Supp. 2d at 123–24; *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 79 (D.D.C. 2010).

As to (c), Plaintiffs' complaint also alleges that the kidnapping "caused harm to and interference with the business and commercial enterprise of Wyatt and Wilson, causing them to sustain economic loss." Compl. ¶ 45. Marvin and Renetta Wilson allege that they suffered economic injuries as a result of the kidnapping, in the form of: (i) "counseling, therapy, or other medical costs" Renetta Wilson Decl. ¶ 18; (ii) the "lost business opportunity in completing and reaping the rewards of the Noah's Ark excavation" when the "British aerospace company that was going to sponsor the excavation and the rather ambitious ensuing commercial development plans, estimated to be worth several millions of dollars, backed out of the project entirely." *Id.* ¶ 19; *see also* Marvin Wilson Decl. ¶ 33 ("the company had anticipated building a tourist park at the site of Noah's Ark, including an airport and hotels, which would involve millions of dollars of investments"); *Id.* ¶ 34 ("[H]ad the PKK not abducted us, we likely would have been responsible for one of the most fantastic archeological discoveries in history. The prestige, benefit to reputation, and financial rewards that would have resulted are immeasurable."), and (iii) the failure of the British aerospace company to reimburse the men for the expense of the trip itself. *Id.*

The Court finds that plaintiffs have not introduced adequate evidence in support of these harms. As to (i) medical costs, plaintiffs have failed to introduce any evidence of what costs specifically were incurred. As to (ii) the lost business opportunity of developing a Noah's Ark tourist park in Turkey, this is simply too speculative to credit. And, as to (iii) the failure to be reimbursed for travel expenses, plaintiffs failed to introduce any evidence supporting this claim.

Accordingly, the Court finds that plaintiffs' claims of economic harms are not adequately proven and thus fail to have a "reasonable connection" to Syria's material support of terrorists.

Finally, as to (d), Mary Wyatt also suggests that her husband Ron's death from cancer is traceable to this kidnapping, in that (i) the financial hardship caused him to defer seeking treatment for his cancer until it had already progressed beyond repair, and (ii) the "intense stress Ron was under" following his ordeal "helped to cause his cancer to grow and spread more quickly." Mary Wyatt Decl. ¶ 14; *see also* Proposed Findings 92 ("Family members of Rob Wyatt attribute his eventual death from cancer as resulting from the physical and psychological abuse he endured during his captivity."). The Court rejects this theory because plaintiffs have not provided adequate evidence to establish a "reasonable connection" between Mr. Wyatt's death from cancer and Syria's material support of the PKK.

Plaintiffs have established a "reasonable connection" between some, but not all of their purported injuries and Syria's support of the PKK. The Court only has jurisdiction over plaintiffs' claims that are based on the physical and psychological injuries suffered by the hostage plaintiffs and the severe emotional distress of the family plaintiffs.

*Sixth*, Syria has been designated as a state sponsor of terrorism continuously since 1979. *See* U.S. Dep't of State, *State Sponsors of Terrorism*, http://www.state.gov/j/ct/list/c14151.htm.

*Seventh*, both Marvin Wilson and Ronald Wyatt were United States citizens at the time of their kidnapping, as are all of the family member plaintiffs. *See supra* ¶¶ 1–12.

*Eighth*, the kidnapping occurred in Turkey, not Syria, so the FSIA's requirement that defendants be given an opportunity to arbitrate this claim is inapplicable.

Accordingly this court has jurisdiction over plaintiffs' claims based on injuries to hostage plaintiffs and emotional distress of the family member plaintiffs, and Syria's sovereign immunity is waived under § 1605A.

**B.      Liability**

Section 1605A(c) provides in part:

> A foreign state that is or was a state sponsor of terrorism . . . shall be liable to . . . a national of the United States . . . for personal injury . . . caused by [the provision of material support or resources for a hostage taking by] that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages.

As the Court has discussed at length elsewhere, the causation and injury requirements "require plaintiffs to prove a theory of liability" in which plaintiffs justify the damages they seek, generally expressed "through the lens of civil tort liability." *Bodoff*, 2012 WL 5995690 at *7 (quoting *Rimkus*, 750 F. Supp. 2d at 176). "Although an analysis of a foreign sovereign's potential immunity and liability should be conducted separately, the elements of immunity and liability under § 1605A(c) are essentially the same in that § 1605A(a)(1) must be fulfilled to demonstrate that a plaintiff has a cause of action." *Kilburn*, 699 F. Supp. 2d at 155. This Court concludes that, having established the requirements of causation and injury necessary to establish subject matter jurisdiction and a waiver of immunity under § 1605A, plaintiffs have also established Syria's liability under § 1605A(c) for the physical and psychological injuries caused by the kidnapping to the hostage plaintiffs and the family member plaintiffs.

## IV.   DAMAGES

Damages available under the FSIA-created cause of action "include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4). Hostage plaintiffs Marvin Wilson and the Estate of Ronald Wyatt (represented by his widow Mary) seek

pain and suffering damages, the family member plaintiffs seek solatium damages, and both seek an award of prejudgment interest.  The plaintiffs also seek punitive damages.  The Court will discuss each in turn.

A.    **Pain and Suffering for Hostage Plaintiffs**

Calculating pain and suffering damages is a difficult task because "there is no market where pain and suffering are bought and sold, nor any standard by which compensation for it can be definitely ascertained, or the amount actually endured can be determined."  *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 22 (D.D. C. 2002).  In hostage cases, some courts have calculated damages on a per diem basis—awarding $10,000 per day held in captivity.  *See, e.g.*, *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134–35 (D.D.C. 2005) (awarding $1,050,000 in pain and suffering for 105 days of captivity).  However, in *Price*, where this Court followed the per diem calculation, it also added a significant amount ($7,000,000) to the per diem amount to compensate plaintiffs for pain and suffering that occurred subsequent to the kidnapping.  *Id.* at 135–36.  Moreover, in cases where the victims suffered harsh treatment and/or were held only briefly, some courts have also dispensed with the per diem measure altogether.  *See Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 234 (D.D.C. 2002) (concluding that the per diem approach undercompensated plaintiff who had been beaten severely while in captivity for only four days, and awarding a lump sum of $1,200,000) *abrogated on other grounds by Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004).

Marvin Wilson and Ronald Wyatt were held for 21 days. They would be entitled to $210,000 each under the per diem measure.  This amount is inadequate to compensate plaintiffs for their injuries. Approximately the same amount was awarded to a victim of false arrest and

detention in a D.C. police station that lasted no more than a day, *see Langevine v. District of Columbia*, 106 F.3d 1018 (D.C. Cir. 1997), but hostage plaintiffs here were subjected to far worse treatment.  True, unlike the plaintiff in *Cronin*, Wilson and Wyatt were not physically beaten during their captivity, but they were subjected to other forms of physical abuse: they were subjected to long marches at gunpoint through the biting cold of the Turkish wilderness and denied adequate shelter, clothing and food, *see supra* ¶¶ 15–21, and, according to his widow, Mr. Wyatt returned home in "relatively bad shape" as "his leg had been badly injured during the abduction." Mary Wyatt Decl. ¶ 11. The men were also subjected to a variety of psychological abuse, including repeated threats of death, being lined up for a simulated execution, being forbidden to speak with one another for several days, being forced to listen to anti-American PKK propaganda, and above all, being forced to endure the uncertainty of knowing whether they would live to see their families again.  *Id.*  Moreover, after returning home, both had lingering physical and psychological effects from this experience.  *See supra* ¶¶ 28–32.  All of this calls for an award greater than what the per diem calculation would require.

Plaintiffs request $5,000,000 for each victim in pain and suffering.  Proposed Findings of Fact 92, Nov. 20, 2012, ECF No. 34. This amount roughly comports with previous awards of pain and suffering by this Court for FSIA hostage cases. *See Price*, 384 F. Supp. 2d at 135–36 (awarding $8,050,000 in total pain and suffering to hostage victims); *Cronin*, 238 F. Supp. 2d at 234–35 (awarding $1,200,000 in total pain and suffering to a hostage victim).  Accordingly, the Court finds that an award to each victim of $5,000,000 in pain and suffering damages is appropriate.

### B.      Solatium for Family Member Plaintiffs

This Court has previously set out a general framework for solatium awards for the relatives of victims killed by terrorist attacks—awarding $4,000,000 to a spouse, $2.5 million to a child, and $1.25 million to a sibling. *See Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 271–359 (D.D.C. 2006). This framework has been extended to cases in which the victim survived a terrorist attack or hostage-taking. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213–14 (D.D.C. 2012).

This framework is also appropriate here. The immediate family members of Wyatt and Wilson suffered an unbearable ordeal in which they could only imagine what would be the fate of their loved ones. Indeed, they too are direct victims of terrorism, as the terror they experienced serves also as a means and end of the actions of terrorists carrying out their criminal acts. Accordingly, this Court awards $4,000,000 each to plaintiffs Renetta Wilson and Mary Nell Wyatt, the spouses of Marvin Wilson and Ronald Wyatt, and $2,500,000 each to Plaintiffs Daniel Wyatt, Amanda Lippelt, Michelle Schelles, Marty Wilson, Kimi Johns, Gina Wilson, Bradley Key, and Barry Key, the children of Marvin Wilson and Ronald Wyatt.

### C.      Pre-Judgment Interest

Plaintiffs seek pre-judgment interest on these awards. "[W]hether pre-judgment interest is to be awarded is subject to the discretion of the court and equitable considerations." *Motion Picture Ass'n of Am., Inc. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992). "When an award without pre-judgment interest fully compensates a plaintiff, an award of pre-judgment interest no longer has the intended compensatory purpose and should be denied." *Price*, 384 F. Supp. 2d at 135. In this case, pain and suffering and solatium damages are both designed to be fully compensatory. Pre-judgment interest is not appropriate and will be denied.

### D.      Punitive Damages

"Punitive damages, made available under the revised FSIA terrorism exception, serve to punish and deter the actions for which they are awarded."  *Bodoff II*, 2012 WL 5995690 at *11 (citations omitted).  In numerous previous civil terrorism cases tried under FSIA, judges have awarded punitive damages to punish defendants and to deter future acts of terrorism.   In determining the proper amount of punitive damages, courts evaluate four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008) (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 32 (D.D.C. 1998)).

In *Gates v. Syrian Arab Republic*, Judge Collyer awarded $300,000,000 in punitive damages against Syria, which she found had provided material support for a terrorist organization responsible for the videotaped execution of two U.S. civilian contractors.  580 F. Supp. 2d 53, 75 (D.D.C. 2008).

Here, the evidence shows Syria supported, protected, harbored, aided, enabled, sponsored, and subsidized the PKK, a known terrorist organization whose operations included the kidnapping of plaintiffs.  *See supra ¶¶* 23-27.  The brutal character of the kidnapping in this case, the significant harm it caused both the hostage plaintiffs and their families, along with Syria's demonstrated and well known policy to encourage terrorism  all merit an award of punitive damages.  *See, e.g., Cronin*, 238 F. Supp. 2d at 235 (D.D.C. 2002) (finding the character of the defendant's act—where the defendant provided material support and resources to terrorist organizations to carry out acts such as kidnapping and torture—supported a punitive damage award of $300,000,000).  This Court will follow the measure used against the same defendant in

the *Gates* case, and award punitive damages against Syria in the amount of $300,000,000.  580

F. Supp. 2d at 75.[18]

## VI.    CONCLUSION

For these reasons, plaintiffs' motion for default judgment shall be granted and final

judgment shall be entered against Syria in the amount of $338,000,000, distributed among

plaintiffs as described above.  A separate order and judgment consistent with these findings shall

issue on this date.

Signed December 17, 2012 by Royce C. Lamberth, Chief Judge.

---

[18] This award satisfies the requirements of due process.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). The award here is far in excess of the compensatory damages awarded, but is commensurate with that awarded in other FSIA cases involving hostages.  *See, e.g.*, *Cronin*, 238 F. Supp. 2d at 236.