**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

------------------------------------------------------------------ X

MARY NELL WYATT, *et al.*,

Plaintiffs, Docket No: 08-cv-502 (RCL)

-against-

SYRIAN ARAB REPUBLIC, *et al.*,

Defendants.

------------------------------------------------------------------ X

**MOTION BY PLAINTIFFS' COUNSEL TO WITHDRAW,**
**TO DECLARE THEIR RIGHTS TO LEGAL FEES,**
**AND FOR RELATED RELIEF**

Plaintiffs' counsel respectfully move this Court for an order:

a) Permitting plaintiffs' counsel to withdraw as the plaintiffs have terminated plaintiffs' counsel;

b) Declaring the rights of plaintiffs' counsel to receive their legal fees in this matter which has already proceeded to judgment;

c) Enforcing counsel's lien for legal fees;

d) Enjoining the plaintiffs from directing the United States Victims of State Sponsored Terrorism Fund ("USVSST Fund") to issue payments on their judgment directly to them, rather than through the Attorney Trust Account of plaintiffs' counsel, and thereby circumventing counsel's lien for legal fees by, and directing the plaintiffs to issue instructions to the USVSST Fund to pay all future payments to the plaintiffs via plaintiffs' counsel's Attorney Trust Account; and

e) Granting such other and further relief as may be just and proper under the circumstances.

Federal courts have ancillary jurisdiction over attorney fee disputes, which may be adjudicated after a dismissal or final judgment in the original underlying action. *See, e.g., Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir. 1991). The rationale for permitting attorneys to assert a charging lien is to protect an attorney's claim of compensation for services rendered before the court. *Wolf v. Sherman*, 682 A.2d 194, 198 (D.C. 1996). It is "merely a claim to the equitable interference by the court to have that judgment held as a security for his debt." *Id.* The D.C. Circuit has long allowed attorneys to intervene in the underlying case to protect their interests, recognizing that charging liens "arise[] out of the underlying action and relate[] back to the inception of the action." *Martens v. Hadley Memorial Hosp.*, 753 F. Supp. 371 (D.D.C. 1990) (citing *Friedman v. Harris*, 158 F.2d 187, 81 U.S. App. D.C. 317 (D.C. Cir. 1946); accord, *Continental Casualty Co. v. Kelly*, 106 F.2d 841 (D.C. Cir. 1939)). The D.C. Circuit has also recognized a "continuing jurisdictional basis premised upon this Court's inherent power to affect the distribution of judgment proceeds." *Id*.

This case concerned a terrorist kidnapping of plaintiffs Marvin T. Wilson and Ronald Wyatt (now deceased) in 1991 by a Syrian-sponsored terrorist group, the PKK. The plaintiffs are the family members of Marvin T. Wilson (Renetta Wilson, Marty R. Wilson, Gina R. Wilson (Brown), Bradley G. Key, Kimi L. Wilson-Johns, and Barry T. Key) and Ronald Wyatt (Mary Nell Wyatt, Daniel Wyatt, Amanda Lippelt, and Michelle Schelles (Brown)).

Plaintiffs first filed an action against the Syrian Arab Republic ("Syria") in 2001 under the former state-sponsored terrorism exception, codified at 28 U.S.C. § 1605(a)(7). *See Wyatt v. Syrian Arab Republic*, 01-cv-1628. Syria appeared by counsel and vigorously defended the case, filing

repeated motions to dismiss on issues of first impression. After those motions were denied Syria filed an unsuccessful interlocutory appeal, *Wyatt v. Syrian Arab Republic*, 266 F.App'x 1 (D.C. Cir. 2008). Congress subsequently repealed the former state-sponsored terrorism exception, and replaced it 28 U.S.C. § 1605A. After the statutory update, plaintiffs timely filed the present action in 2008 as "related" to their original case, to take advantage of the terms contained in the new provision. To avoid duplicative litigation, the Court dismissed the initial action. *See Wyatt*, 01-cv-1628, Dkt. No. 98. Syria appeared in and defended this action, too. Ultimately, after its motion to dismiss in this action was denied, Syria refused to litigate on the merits and was defaulted. Plaintiffs submitted evidence of Syria's liability, and proof of plaintiffs' damages. On December 17, 2012 this Court entered judgment in favor of the plaintiffs and against Syria in the amount of $338 million, consisting of $38 million for compensatory damages allocated among the individual plaintiffs, and $300 million of punitive damages allocated to all the plaintiffs collectively (Dkt. 37, 38). After the judgment was entered, Syria again appealed. The judgment was affirmed by the D.C. Circuit, *Wyatt v. Syrian Arab Republic*, 554 F. App'x 16 (D.C. Cir. 2014). Thereafter the judgment was served on defendant Syria in accordance with 28 U.S.C. § 1608(e), and on May 19, 2014 the Court granted plaintiffs' motion for an order pursuant to 28 U.S.C. § 1610(c) (Dkt. 60).

Thus, unlike in most FSIA terror actions, plaintiffs' counsel in this case had to prosecute the action against a defendant which appeared by counsel and aggressively fought the case on jurisdictional and procedural grounds, in this Court and in the Court of Appeals, for 13 years.

Thereafter, plaintiffs' counsel attempted to enforce the judgment. These efforts included an attempt to enforce the judgment against some Syrian funds on which other judgment creditors of Syria had already commenced enforcement proceedings at a point before the judgment herein had become final, *Wyatt v. Syrian Arab Republic,* N.D. Ill. 14-cv-6161. This enforcement effort

involved challenging other judgment creditors' priority to collect these assets, and there was another creditor of Syria also vying for those assets, *Gates v Syrian Arab Republic*, 755 F.3d 568 (7th Cir. 2014). Such competitions between judgment creditors are common under the Foreign Sovereign Immunities Act, as the Seventh Circuit has explained:

> [T]he FSIA does not provide a mechanism for distributing equitably among different victims any Syrian assets in the United States that are subject to attachment. Instead, victims who finally obtain judgments must then engage in the costly, burdensome, and often fruitless task of searching for available assets.
>
> These victims of terror can then find themselves pitted in a cruel race against each other—a race to attach any available assets to satisfy the judgments. The terms of the race are essentially winner-take-all rather than any equitable sharing among victims of similar losses. Under the FSIA's compensation scheme, a terrorism judgment against Syria can be satisfied only at the expense of other terrorism victims.

*Id.*, 755 F.3d at 571. In the end, plaintiffs' efforts to enforce the judgment against the Chicago assets were unsuccessful. Plaintiffs appealed to the Seventh Circuit, then sought rehearing *en banc*, and then sought certiorari to the U.S. Supreme Court, but the result remained unchanged. *Gates v. Syrian Arab Republic*, No. 11 C 8715, 2014 U.S. Dist. LEXIS 149976 (N.D. Ill. Oct. 22, 2014), aff'd *Wyatt v. Syrian Arab Republic*, 800 F.3d 331 (7th Cir. 2015), cert denied *Wyatt v. Gates*, 136 S. Ct. 1721 (2016).

Plaintiffs also attempted to enforce their judgment against the top-level internet domain name of Syria, '.sy'. That enforcement process took place in this case, *see* docket entries 69 *et seq.*, and was consolidated with identical enforcement efforts against the Syrian, Iranian, and North Korean top level domains in several other FSIA cases involving the Iranian, North Kroean, and Syrian top level domain names (Dkt. 76). Had this enforcement effort prevailed, the plaintiffs would have been able to auction off the .sy top level domain and it would have resulted in a substantial payment on their judgment. Unfortunately, though, this Court decided against the

plaintiffs, *Stern v. Islamic Republic of Iran,* 73 F. Supp. 3d 46 (D.D.C. 2014), aff'd *Weinstein v. Islamic Republic of Iran*, 425 U.S. App. D.C. 1, 831 F.3d 470 (2016), rehearing denied *Weinstein v. Islamic Republic of Iran*, Nos. 14-7193, 14-7194, 14-7195, 14-7198, 14-7202, 14-7203, 14-7204, 2016 U.S. App. LEXIS 17160 (D.C. Cir. Sep. 19, 2016).

Plaintiffs also moved in this case to enforce the judgment against $150,036.21 of Syrian assets located at Abu Dhabi international bank. (Dkt. 63). Syria's counsel, Ramsey Clark, Esq., responded that these funds were intended as his legal fees (Dkt. 65). On March 18, 2015 this Court held that the funds at issue were protected from being reached by judgment enforcement proceedings pursuant to the Vienna Convention on Diplomatic Relations, and denied the plaintiffs' application. (Dkt. 108).

Plaintiffs also twice served subpoenas on the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), on March 3, 2014 and November 25, 2015 seeking information regarding any known Syrian assets in the United States (Dkt. 57-1, 112-1). OFAC filed motions for protective orders to govern confidentiality of any documents produced (Dkt. 57, 112), and those motions were granted (Dkt. 58, 113). Unfortunately, the documents obtained from OFAC did not reveal the existence of any viable avenues of enforcement of the plaintiffs' judgment.

In a further effort to discover assets against which the plaintiffs' judgment could be enforced, Ms. Darshan-Leitner met with senior Israeli intelligence officials in an effort to learn more about the Syrian economy and possible avenues of collection. The information received indicated that during the years following the judgment in this case, Damascus engaged in very little manufacturing and export of merchandise as a result of the Syrian Civil War and international diplomatic estrangement of the Assad regime. The US and European Union and their allies, which

might otherwise be jurisdictions where the judgment could be enforced, had themselves levied sanctions against Syria and made it illegal to engage in trade. Basically, the countries that continued to remain economically connected to Syria were hostile states where the judgment cannot be enforced.

On December 18, 2015, Congress enacted the United States Victims of State Sponsored Terrorism ("USVSST") Act, codified at 34 USC § 20144. The USVSST Act created a fund into which moneys paid as fines and forfeited by violators of United States sanctions programs would be deposited, and which would be paid out *pro rata* and with certain caps and limitations to victims of terrorism who held judgments against state sponsors of terrorism and also former hostages from the Carter-era Iran hostage crisis. The plaintiffs' judgment against Syria made the plaintiffs eligible to receive compensation from the USVSST Fund. Accordingly, the undersigned prepared applications for each of the plaintiffs to receive compensation from the Fund, and assisted the plaintiffs with ancillary matters such as probating the will of plaintiff Ronald Wyatt which had never been probated but which had to be resolved for the Estate of Ronald Wyatt's application to the Fund to be processed, and assisting certain of the plaintiffs in obtaining loans from lawsuit lenders against the anticipated proceeds of the USVSST Fund payment.

The first round of awards was made by the USVSST Fund in February 2017. Distributions were received from the Fund into the Attorney Trust Account of plaintiff's counsel in March 2017, except for the award to the Estate of Ronald Wyatt which was delayed due to the probate matter and was received into the Attorney Trust Account on May 26, 2017. The total of the 2017 payments by the Fund for all the plaintiffs in this case was $5,189,318.

The statute that created the Fund caps legal fees and disbursements on moneys paid from the Fund at 25%, 34 USC § 20144(f). Accordingly, the undersigned distributed to each plaintiff

75 percent of the amount recovered for each client. The remaining 25%, *i.e.*, $1,297,329.50, was retained as attorneys' fees and for disbursements.

The USVSST Fund made no distribution in 2018, as per the USVSST Act there was to be no distribution in year two of the Fund, 34 U.S.C. § 20144(d)(4).

In January 2019 (year three of the Fund) the USVSST Fund made its second distribution. The plaintiffs received a total of $902,033.43, which was received into the Attorney Trust Account of the undersigned. The undersigned then distributed 75% of that amount to the plaintiffs, and retained 25%, *i.e.*, $225,508.36, for legal fees and disbursements.

A further distribution from the USVSST Fund is anticipated in January 2020. The amount of that distribution is not yet known.

At this point, the undersigned is aware of no other viable options for enforcing the judgment. Syria is mired in a lengthy civil war that has resulted in it being subjected to extreme international sanctions and a large percentage of its population leaving the country or being killed, as a result of which the Syrian economy is in a shambles and there is very little trade with Syria and no Syrian assets known to exist outside of Syria or in the United States. This situation may change once the Syrian Civil War comes to an end, but for now it is the reality. Accordingly, there are no enforcement proceedings now pending.

Enforcing FSIA judgments rendered under the state sponsor of terrorism exception to sovereign immunity is made even more difficult by the fact that many foreign countries do not accept this exception to sovereign immunity, and/or do not accept the U.S. legal rule that personal jurisdiction can be obtained over foreign states whenever service is perfected and an exception to immunity exists, and will therefore not domesticate and enforce the judgments; or, they have requirements for service of process on the foreign country that cannot realistically be met in the

present climate where the countries involved—Syria here, but often also Iran or North Korea—are subjected to strict sanctions and have no local presence in the United States and/or the country of potential domestication. For example, on July 31, 2019 a court in England denied an application to domesticate and enforce 12 FSIA judgments on behalf of 121 plaintiffs against Iran in the United Kingdom on these grounds. *Estate of Michal Heiser v. Islamic Republic of Iran,* [2019] EWHC 2074 (QB) (available at https://www.bailii.org/ew/cases/EWHC/QB/2019/2074.html). Similarly, the undersigned, working together with Ms. Darshan-Leitner and Alberto Mansour, Lic., a prominent Mexican attorney, attempted in 2015 to enforce the judgment rendered in *Kim v. Democratic People's Republic of Korea,* 87 F.Supp.3d 286 (D.D.C. 2015), an FSIA judgment against North Korea by execution on a North Korean ship that had been seized by the Mexican government, but that effort was rejected by the Mexican courts on similar grounds. *Kim v. República Popular Democrática de Corea del Norte*. Even in Israel plaintiffs have been unsuccessful. In 2009 Ms. Darshan-Leitner's office in Israel attempted to domesticate into Israel and enforce the judgment rendered in *Stern v. Islamic Republic of Iran,* 271 F.Supp.2d 286 (D.D.C. 2003) and *Rubin v. Islamic Republic of Iran,* 281 F. Supp. 2d 258 (D.D.C. 2003), against a debt owed by the Israeli government to the Iranian government (a debt dating back to the pre-revolutionary times of the Shah). Other lawyers representing the plaintiffs in *Steen v. Islamic Republic of Iran,* 2003 U.S. Dist. LEXIS 12108, 2003 WL 21672820 also joined that effort. *Stern* filed first in a district court in Nazereth, and got a decision granting leave for alternative service. Then the Israeli government intervened and moved to transfer the case to the district court in Jerusalem (where *Rubin* filed, and the case was joined with *Steen* who had also filed in the meanwhile). The Israeli government moved to quash *Stern*'s alternative service, and took the position that service could only be done via diplomatic channels, which did not exist. The

Jerusalem district judge quashed *Stern*'s alternative service, but held that the government had to effect service via non-diplomatic means in the absence of diplomatic channels. Ultimately, though, on appeal the Israeli Supreme Court agreed with the Israeli government that service on foreign states can only be done via diplomatic channels. *The Attorney General v. Steen, et al.,* Civil Appeal (Leave) 1104/09 (Israeli Supreme Court).

This Court is well aware of the difficulties surrounding enforcing FSIA judgments against state sponsors of terrorism, as discussed in this Court's "Call for Meaningful Reform" in *In re Islamic Republic of Iran Terrorism Litig.,* 659 F. Supp. 2d 31, 120 (D.D.C. 2009) (referring to the FSIA as a "failed policy"). Although that decision was specifically addressing enforcement of judgments against Iran and noted the dearth of Iranian assets in the United States against which FSIA judgments could be enforced, the same comments would apply to Syria.

One of the plaintiffs, plaintiff Marvin T. Wilson, has called the undersigned many times insisting that something more should be done to enforce the judgment, but never specifying what, and expressing dissatisfaction that no enforcement proceedings are being brought (beyond the several million dollars that the plaintiffs have already received from the USVSST Fund). On December 20, 2018 Mr. Wilson emailed Ms. Darshan-Leitner and her husband stating that "Syria is a functional sovereign nation with over 60 billion in exports and do have funds located in countries who have not honored international sanctions, including USA, against Syria." (Ex. A). I responded the next day to Mr. Wilson stating:

> Syria has been mired in a disastrous civil war that has decimated its economy, destroyed its country, run up massive debts, and caused hyperinflation. Just look on Wikipedia under "Syrian Economy" and you'll see that Syria's exports in 2017 were estimated at just $1.7 billion. The government's revenues are just $1.3 billion, and public debt is 60% of GDP. Another website estimates Syria's exports at just $748 million. https://atlas.media.mit.edu/en/profile/country/syr/. Syria is not in any

> way a functional nation, until recently it has been barely sovereign, and it certainly does not have anything resembling the level of economic activity you mention.
>
> You also refer to enforcement of your judgment in countries that have not honored international sanctions. While there are such countries, they are places like Somalia, Iran, North Korea, Yemen, etc., which are very unlikely to recognize, domesticate, and enforce an American FSIA judgment.

(Ex. A). The undersigned has repeatedly explained to Mr. Wilson that there presently do not appear to be any viable enforcement options beyond the USVSST Fund, though this would likely change after the Syrian Civil War ends. Responding to Mr. Wilson's suggestion in his December 20, 2018 email that he had found another attorney, Charles Camp, Esq., whom he believed could enforce the judgment, the undersigned informed Mr. Wilson that if the plaintiffs wish to have another attorney work on judgment enforcement we would be happy to work alongside such other attorney, and that there was even provision in our contingency fee retainer agreement for such an arrangement. (Ex A). No such attorney ever materialized.

On or about July 19, 2019 the undersigned received a letter dated July 12, 2019 purportedly signed by each of the plaintiffs[1] which expressed dismay that no enforcement proceedings are underway, and terminated the undersigned, along with plaintiffs' Israeli counsel, Nitsana Darshan-Leitner. A copy of that letter is annexed as Exhibit B.

The termination letter contains multiple statements that are false and inaccurate, and its submission with this motion should not be construed as agreement with anything stated therein. There has also been a series of letters and email exchanges between counsel and the plaintiffs following the termination letter with which we will not burden the Court unless it becomes

[1] The signatures are referred to as "purported" because they are not notarized. Also, plaintiff Marty R. Wilson has apparently passed away, and the letter is signed for him by his father Marvin T. Wilson "as personal representative of the Estate of Marty R. Wilson," but the undersigned has not seen any letters of administration or any other document so appointing Marv Wilson.

necessary based on the plaintiffs' response to this motion. It is possible they will not press certain assertions that they have been shown are false.

It is also clear that the termination letter as well as the plaintiffs' subsequent communications,[2] were ghost written for the plaintiffs by an attorney lurking in the shadows. However, that phantom attorney has not appeared or communicated directly.

Since we have received what purports to be a letter of termination from our clients, the undersigned is obligated to file this motion seeking to withdraw as counsel.

Additionally, the termination letter and our communications with the plaintiffs subsequent to the termination letter make it clear that the plaintiffs are taking the position that following termination the undersigned is no longer entitled to receive a contingency fee percentage of future payments from the USVSST Fund or any potential future collections made on the plaintiffs' judgment that we obtained for them. The termination of counsel and this withdrawal motion therefore require that the rights to ongoing legal fees be determined, as well as the mechanics of future payments (i.e. distribution of the entire amount by the USVSST Fund to the plaintiffs and hoping they will pay the legal fees, versus distribution as in the past via the Attorney Trust Account of the undersigned or some other neutral attorney).

Representation of the plaintiffs in this matter began in 2001. At that time, plaintiffs' U.S. counsel of record was Rhode Island attorney David Strachman, Esq. Mr. Strachman's retainer agreement provided for a one-third contingency fee, and further provided that the representation could be apportioned with other attorneys who may provide legal services. Mr. Strachman worked

---

[2] All the communications seem to have been drafted by a lawyer with the exception of one extremely disturbing email from plaintiff Bradley Key consisting of a quote from Matthew 21:13 regarding Jesus throwing money changers and dove sellers out of the Temple courtyard in Jerusalem and accusing them of creating a "den of thieves."

on this case together with noted Israeli human rights lawyer Nitsana Darshan-Leitner, an attorney whom this court may recall was involved in other cases before this Court. During the period when Mr. Strachman was counsel of record, all the factual research underlying the case, and all the substantive pleadings and submissions were prepared by attorneys affiliated with Ms. Darshan-Leitner's office in Israel, and all the expenses of the case, including the expenses of retaining experts to provide expert testimony, were paid by Ms. Darshan-Leitner, although some were advanced initially by Mr. Strachman or the undersigned and then reimbursed by Ms. Darshan-Leitner.

Mr. Strachman continued as counsel of record in this court until 2012. On March 30, 2012 Mr. Strachman filed motions in this case and the earlier 2001 case precursor case seeking permission to withdraw as counsel advising the Court that "[f]or personal and professional reasons" he was "unable to continue...federal court practice" and that he had "curtailed and withdrawn...involvement in all federal court litigation and cases involving terrorism victims (with one exception)." (Dkt. 95 in 01-cv-1628; Dkt. 24 in 08-cv-502). Both motions to withdraw were granted on May 17, 2012 (Dkt. 98 in 01-cv-1628; Dkt. 27 in 08-cv-502).

In his motions to withdraw, seeking to persuade the Court that the clients would not be prejudiced by his withdrawal, Mr. Strachman described the counsel arrangement up to that point as follows:

> Prior to the inception of this litigation, plaintiffs retained Attorney Darshan-Leitner regarding the terrorist attack which is the subject of these cases. Attorney Darshan-Leitner and lawyers associated with her office were involved in initiating this litigation and have participated in all aspects of this case. After organizing the litigation, they sought the assistance of the undersigned to serve as counsel in Washington and have continued representing plaintiffs throughout every phase of this litigation. The undersigned has been informed by attorneys at that firm that they are actively engaged in seeking new counsel for plaintiffs. They have indicated

> that under the circumstances, counsel should move to withdraw and advised the undersigned to file this motion.

(Dkt. 24, 08-cv-502, p. 7, n.2). Mr. Strachman further stated "Plaintiffs are also represented by the Law Office of Nitsana Darshan-Leitner of Tel Aviv who is helping plaintiffs obtain successor counsel for this litigation." (Dkt. 24, 08-cv-502, p. 7).

Each of the plaintiffs signed a statement, submitted along with Mr. Strachman's motion to withdraw, consenting to Mr. Strachman's withdrawal (Dkt. 22-2 – 22-12).

On May 17, 2012 this Court entered an order granting Mr. Strachman's motion to withdraw, and directing the Clerk to serve a copy of the order on each of the plaintiffs. (Dkt. 27). That order set the matter down for a status conference on July 2, 2012, and ordered that if new counsel did not appear for the plaintiffs by July 1, 2012, the day before the status conference, then the plaintiffs would have to appear *pro se* and each plaintiff would have to appear personally at each scheduled proceeding herein. (Dkt. 27).

After Mr. Strachman's withdrawal from the case, at the request of Ms. Darshan-Leitner, the undersigned became involved in this case shortly before the July 1, 2012 deadline for appearance of counsel. On July 1, 2012, both Mary Nell Lee (widow of deceased plaintiff Ronald Wyatt) and plaintiff Marvin T. Wilson emailed Ms. Darshan-Leitner indicating agreement with the following statement:

> This is to confirm that we have agreed to retain Israeli attorney Nitsana Darshan Leitner to represent us in our litigation against Syria. The legal fee will be a contingent 1/3 of the gross recovery, with nothing due if there is no recovery. We authorize Ms. Leitner to engage Robert J. Tolchin, Esq. and his firm, The Berkman Law Office, LLC, as U.S. counsel, who will be paid by Ms. Leitner out of the 1/3 contingency fee. We will execute a written contingency fee retainer agreement with Ms. Leitner within the next few days, but authorize Mr. Tolchin to appear on our behalf at the hearing on Monday, July 2, 2012 before Judge Lamberth.

(Ex. C, D).

In reliance on these emails from the Wyatt and Wilson families, the undersigned, working together with Ms. Darshan-Leitner, filed a notice of appearance on July 1, 2012 (Dkt. 28), attended the status conference on July 2, 2012, and proceeded to prepare expert testimony on liability, conducted a hearing on liability at which the experts testified on August 21, 2012, proceeded to prepare and submit proof of the plaintiffs' damages and proposed findings of fact and conclusions of law, and generally finished the case through to final judgment, then handled the defendant's appeal, then translated and served the judgment on the defendant as required by 28 U.S.C. § 1608(e), successfully moved for leave to enforce the judgment pursuant to 28 U.S.C. § 1610(c), and then undertook the enforcement efforts described above.

The execution of a formal contingency fee retainer agreement to supersede the July 1, 2012 agreement (Ex. C, D) did not take place until December 2015, after a process of revisions and clarifications that began with a first draft circulated in October 2014. The contingency fee retainer agreement ultimately signed by each and every one of the plaintiffs provides that the plaintiffs retained both "The Berkman Law Office, LLC [the undersigned's firm] and the Israeli Law Office of Nitsana Darshan-Leitner." (Ex. E). The contingency fee retainer agreement states that:

> It is understood that this representation began in 2008[3] and that the Attorneys have already obtained a judgment on the Clients' behalf and have engaged in efforts to enforce that judgment. This retainer agreement is intended to clarify the terms of the retention.[4]

---

[3] The representation had actually begun in 2001, with the filing of the initial suit under FSIA § 1605(a)(7), the on-going pendency of which permitted the filing of this action under FSIA § 1605A in 2008. Thus, in retrospect it would have been more accurate if the retainer had stated that the representation began in 2001, but it makes no difference for present purposes.

[4] In his December 20, 2018 email Marvin T. Wilson described this contingency fee retainer agreement as follows: "The agreement documented an earlier agreement we had with you before the Berkman Law firm was involved and retained the contingency agreement of 33.33% for the Berkman Law Office, LLC and the Israeli Law Office of Nitsana Darshan-Leitner." (Ex. A).

*Id.* Regarding the fee, the contingency fee retainer agreement provides:

> In consideration of the services rendered and to be rendered by Attorney, Client hereby agrees to pay Attorney, assigns to Attorney, and authorizes the Attorneys to retain out of any moneys that may come into Attorney's hand by reason of the above claim, including by any claims tribunal or government compensation, a fee of one-third (33.33%) of the sum recovered ("Fee") plus any applicable value added tax. In the event any law or regulation mandates a lower Fee, the provisions of such law or regulation will supersede this agreement with respect to any recovery governed by such law or regulation.

*Id.* The contingency fee retainer agreement makes provision for the possibility of hiring additional counsel for specific judgment enforcement proceedings and authorizes an additional 10% collection fee for such additional counsel. Finally, the contingency fee retainer agreement provides that any fees due to plaintiffs' former counsel David Strachman, Esq. would be paid by the undersigned and/or Ms. Darshan-Leitner:

> Additionally, any fees to which Clients' former counsel, David Strachman, Esq., or his firm, may be entitled, shall be paid by the Attorney out the Fee, and in no way shall reduce the recovery of the Client.

*Id.*

In 2016, after the creation of the USVSST Fund, the undersigned prepared applications to the USVSST Fund for each of the plaintiffs. These application forms were signed by each of the plaintiffs for submission to the Fund. The contingency fee retainer agreement described above was submitted with each of USVSST Fund forms. When the 2017 and 2019 payments were made by the Fund, they were made into the Attorney Trust Account of the undersigned, and the balance after deducting legal fees at the 25% capped rate per 34 USC § 20144(f) was then wired to each of the plaintiffs per their individual wire instructions.

Additionally, in 2017, after the first payment was received from the USVSST Fund, and in keeping with the terms of the contingency fee retainer agreement, the undersigned negotiated a

settlement with Mr. Strachman regarding his fees, and the agreed-upon amount was paid to Mr. Strachman by the undersigned from the attorney fee portion of the USVSST Fund award. Thus, in keeping with the terms of the contingency fee retainer agreement, the undersigned resolved what otherwise would have been Mr. Strachman's claim against the plaintiffs for fees. The plaintiffs have accepted the benefit of that bargain, as they neither paid Mr. Strachman for fees nor disbursements, despite having benefited from his services for 11 years.

The contingency fee retainer agreement (Ex. E) is the operative retainer agreement in effect between the plaintiffs and the undersigned. It has never been modified.

The plaintiffs do have the right to terminate the undersigned as counsel. We agree the plaintiffs have the right to be represented by new counsel, or to proceed *pro se* if they wish. However, no change of counsel affects the entitlement of the undersigned to enforce the terms of the contingency fee retainer agreement.

Representation at all phases of this action, as well as its predecessor action, has always been on a one-third contingency fee basis, subject to any statutory caps. One-third contingency fees in personal injury cases is standard, and actually in some places, such as Texas, where the Wilsons live, rates as high as 40% are common. A contingency fee is particularly fair in this case since at the time the case was filed the likelihood that any judgment obtained would be collected was remote. It must also be noted that the plaintiffs had not commenced an action for nearly 10 years after the events that gave rise to their claim, and had allowed six years of the 10 year statute of limitations (they had 10 years from 1996) to expire without filing suit.[5] It was plainly the

[5] It must be emphasized that in the nearly 10 years after the events that gave rise to the plaintiffs' claim the plaintiffs had not brought suit against anyone. It was Ms. Darshan-Leitner's office that developed the idea of suing Syria on behalf of the Wyatt and Wilson families for Syria's support of the PKK terrorist group. Nobody had ever sued Syria on this theory before, nor has anyone done so since. Nobody else ever

availability of counsel willing to work on contingency fee basis that enabled this action and its predecessor to be filed.

The termination letter received from the plaintiffs takes the position that "any work you have performed on our case in the past has been well-compensated through payments received from the terrorist victim fund." (Ex. A). This statement seemed to suggest that the plaintiffs contend that we should not be paid our 25% capped percentage out of any future USVSST Fund payouts, and that we are not entitled to be paid any legal fees in the event that the plaintiffs recover money in the future from some other source. This point was clarified in subsequent correspondence with the plaintiffs, and indeed our perception seems to have been correct: the plaintiffs apparently believe they can terminate us as counsel without owing us any further fees.

The plaintiffs have given concrete manifestation to their belief that they do not owe legal fees on future recoveries by notifying the USVSST Fund that they have terminated us and directing the Fund not to communicate with us, as is confirmed by correspondence from the Fund (Ex. F). Upon inquiry, the USVSST Fund advised us by email that their practice is to issue payment of claims only to the claimant directly, or to the claimant's current counsel's trust account (Ex. G).

It is thus clear that the plaintiffs have set out to terminate us and to engineer that the next USVSST Fund payment—expected in January—will go directly to them from the Fund, without deduction of legal fees, apparently believing that they can avoid paying legal fees on future

---

informed the families they had an opportunity to pursue a notorious state sponsor of terrorism like Syria. Had Ms. Darshan-Leitner and Mr. Strachman not alerted the plaintiffs of their rights, neither family would ever have known they could seek recompense, nor would they have recovered the millions of dollars they have recovered thus far, nor would we be discussing future recoveries. Nobody else looked out for the Wilsons' and Wyatts' interests, conceived a theory, backed it up with research, retained experts, undertook litigation, and navigated it successfully to judgment. Nor was anyone else willing to finance such an unprecedented case or invest years of work on their behalf. The plaintiffs' dissatisfaction is thus frankly remarkable.

payments. It is unclear whether they actually have any concrete plan to enforce the judgment other than via the Fund, but their game plan seems also to be to try to get away without paying legal fees to us on any such future enforcement.

It is the position of the undersigned and Ms. Darshan-Leitner that by obtaining a final, non-appealable judgment we have become fully entitled to payment of legal fees on any collections. As regards the money payable from the USVSST Fund, all of that is subject to an obligation to pay legal fees to us. Plaintiffs have already received two distributions from the USVSST Fund over the past three years from which our 25% legal fees have been deducted without any objection by the plaintiffs. By the grace of the statutory fee cap on recoveries from the Fund, 34 USC § 20144(f), the plaintiffs only have to pay 25% and not one-third, an 8.33% reduction which is already a tremendous benefit to them.

Regarding potential future collections from sources other than the Fund, we would be entitled to one-third of the sum recovered. The plaintiffs have already agreed in the contingency fee retainer agreement that if another lawyer is needed to collect the judgment, that other lawyer would be entitled to a separate contingency fee of up to an additional 10% of any sum collected. At this time, however, talk of other collections appears to be pie-in-the-sky.

It is therefore respectfully requested that besides permitting the undersigned to withdraw based on the plaintiffs' letter of termination, the Court should enter an order declaring the rights of counsel to legal fees on future recoveries, including future payments from the USVSST Fund as well as any potential collections in full or partial satisfaction of the plaintiffs' judgment. As to future payments from the USVSST Fund, the Court should declare that since withdrawing counsel completed all work necessary to obtain those payments, the right of counsel to be paid 25% of all future recoveries from the Fund have fully vested. As to potential future collections, the Court

should declare that counsel is entitled to one-third of any sums collected, without prejudice to the right of any future lawyer handling any particular supplemental proceeding to separate contingency fees of up to 10% collected as agreed to by the plaintiffs in the fee agreement.

We are further concerned, however, by the plaintiffs' having instructed the USVSST Fund not to communicate with us, and the USVSST Fund's position that in this circumstance they will pay only the claimant and will not pay the undersigned the 25% legal fee, thereby circumventing the lien of the undersigned on 25% of the recover from the Fund.[6] We therefore respectfully request that the Court issue an order compelling the plaintiffs to instruct the Fund to issue future payments to the Attorney Trust Account of the undersigned as was the practice with all past payments from the Fund, so that the undersigned can guarantee receipt by counsel of the 25% portion of the recovery. One might think that compelling the plaintiffs to pay the 25% upon receiving their distributions would be sufficient, but the plaintiffs' personal accounts are merely personal accounts of individuals, and are not subject to the ethical stringencies of attorney trust accounts. Once the money would reach the individual plaintiffs, if the 25% attorney's fees are not paid over the undersigned may wind up with little recourse. On the other hand, if the distributions from the Fund

---

[6] The USVSST Fund's position in the attached email (Ex. G) cites only the Frequently Asked Questions ("FAQ") of their website. Its position is actually not supported by the USVSST Act, 34 U.S.C. 20144, or the implementing regulations, 81 Fed. Reg. 135 (July 14, 2016) (available at http://www.usvsst.com/docs/Notice.pdf). The statute provides only that "The Special Master shall order payment from the Fund for each eligible claim of a United States person to that person or, if that person is deceased, to the personal representative of the estate of that person." 24 U.S.C. § 20144(d)(1). Nothing in that language restricts the right or obligation of the Fund to respect and not circumvent attorney liens, or alter the background legal concept that payment of legal fees owed by the claimant is tantamount to paying the claimant. "Debts payable by clients to attorneys should in general be subject to the same rules that normally apply to other debtor-creditor relationships." *Wolf*, 682 A.2d at 201. If the order sought herein does not have the effect of eliciting from the USVSST Fund confirmation that the Fund will pay 25% of the payment to the undersigned, a further application on notice to the Fund will be made for an order compelling the Fund to do so.

are routed through the Attorney Trust Account of the undersigned, there is no doubt that it will be distributed by the undersigned, who is an officer of the Court, in strict and prompt compliance with the Court's ruling. The undersigned would also not object if some other attorney, another officer of the Court, were appointed agent to receive the money and distribute according to the Court's ruling. Nor would the undersigned object if the plaintiffs were ordered to instruct the Fund to make the future distributions 25% to the undersigned and 75% to the plaintiffs, assuming the Fund would honor such a request.

The undersigned, along with Israeli counsel Ms. Darshan-Leitner, did our work and obtained the judgment for the plaintiffs which enables them to get paid from the USVSST Fund. The work was rendered on contingency fee basis with the explicit right of counsel to collect the money and retain legal fees, and an assignment to counsel of the legal fee portion of any recovery. The undersigned is entitled to be paid for his work in the usual manner of contingency fees and in accordance with the retainer, and should not be relegated to chasing 12 individual, out-of-state plaintiffs.

Dated: Brooklyn, New York
August 20, 2019

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
*Attorneys for the Plaintiffs*

by: ______________________
Robert J. Tolchin

111 Livingston Street, Suite 1928
Brooklyn, New York 11201
718-855-3627

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the date indicated below a true copy of the foregoing was served via United States First Class Mail to the following:

Marvin T. Wilson
2287 North Preston Road
Celina, Texas 75009

Renetta T. Wilson
2287 North Preston Road
Celina, Texas 75009

Barry T. Key
3534 Deeds Road
Houston, Texas 77084

Gina R. Wilson
1300 North Custer Road, #3305
Allen, Texas 75013

Bradley G. Key
4053 FM 2207
Gladewater, Texas 75647

Kimi L. Wilson-Johns
614 County Road 4446
Whitewright, Texas 75491

Mary Nell Lee
3413 Greens Mill Road
Spring Hill, Tennessee 37174

Amanda B. Lippelt
480 White Oak Trail
Spring Hill, Tennessee 37174

Michelle L. Schelles
387 Shaw Road
Shelbyville, Tennessee 37160

Daniel K. Wyatt
134 Chippendale Drive
Hendersonville, Tennessee 37075

Dated: Brooklyn, New York
August 20, 2019

Robert J. Tolchin