**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

-------------------------------------------------------------------X

MARY NELL WYATT, *et al.*,

                Plaintiffs,               Docket No: 08-cv-502 (RCL)

      -against-

SYRIAN ARAB REPUBLIC, *et al.*,

                Defendants.

-------------------------------------------------------------------X

## <u>DECLARATION OF ROBERT J. TOLCHIN</u>

Robert J. Tolchin, of Brooklyn, New York, declares pursuant to 28 U.S.C. § 1746, as follows:

1.      I am an attorney licensed to practice law in the States of New York and New Jersey, and am a member of the Bar of this Court. I was counsel to the plaintiffs in this action from July 2, 2012 until the present motion to withdraw.

2.      In the plaintiffs' opposition papers plaintiff Marv Wilson asserts that Ms. Darshan-Leitner and I have refused to make efforts to collect the judgment. This is false. We have at all times been ready, willing, and able to pursue collection proceedings on behalf of the plaintiffs, and we have in fact pursued multiple avenues of judgment enforcement, albeit without success. The problem we face is that to our knowledge there are no known Syrian assets located in any jurisdiction that will permit enforcement of our judgment. Syria has been embroiled in an extremely destructive and expensive civil war since 2011, and has been placed under severe sanctions by the United States and many other countries. There is simply no Syrian trade going on, and the Syrian regime simply does not maintain assets in the United States or any other relevant jurisdiction. If the plaintiffs have knowledge of a Syrian asset that could be pursued with

a judgment enforcement proceeding, they have never informed us of what it is, but if it exists we were and are eager to pursue it and would do so within the terms of our existing retainer agreement.

3.      Over the years, I received numerous telephone calls from plaintiff Marv Wilson asking about judgment enforcement. He would routinely call me on my personal cell phone and I would always take his call and talk to him, unless he called while I was in court or otherwise unable to answer. I do not have an exact count, but I probably spoke to Marv Wilson in excess of 50 times, likely more. And that was in addition to scores of emails over the years. Accordingly, and respectfully, I do not know what Marv Wilson is talking about when he complains in his declaration about my alleged lack of communication.

4.      During many of those telephone calls, Marv Wilson would ask about judgment enforcement. I repeatedly explained to him that there were no known Syrian assets, that Syria was in the midst of a civil war and international sanctions, so finding Syrian assets would be hard, but that Ms. Darshan-Leitner and I constantly had our ears to the ground trying to find judgment enforcement opportunities. I routinely told Marv Wilson that I believed once the Syrian civil war ends, Syria will want to end the sanctions and will have to resolve its judgments if it wants to resume international trade, just as Libya had done in 2008. I know that Marv Wilson did not like this news, but I believe it is the reality, and I clearly communicated it to him. He may not like the message, but this messenger did not fail to communicate.

5.      On December 20, 2018, Marv Wilson emailed Ms. Darshan-Leitner complaining about no enforcement activity going on and asking if he could retain another lawyer to assist in collection. Mr. Wilson's email cited outdated economic information about Syria as his basis to believe that there were judgment enforcement opportunities available. Ms. Darshan-Leitner forwarded the email to me for response. I responded to Mr. Wilson as follows:

Marv,

Nitsana has forwarded your email to me and asked that I respond.

If you have a law firm that has a concrete approach to enforcing your judgment, we would certainly be willing to work with them. Please have this law firm get in contact with me, or provide me their contact information and I will reach out to them. You are correct: there is no reason we would not want to do this. It is premature to discuss this law firm's fees. The time to discuss that is after we hear what ideas they have and decide whether we think it is a viable plan.

Please note, though, that the factual assumption you make in your email that "Syria is a functional sovereign nation with over 60 billion in exports" is simply not true. Syria has been mired in a disastrous civil war that has decimated its economy, destroyed its country, run up massive debts, and caused hyperinflation. Just look on Wikipedia under "Syrian Economy" and you'll see that Syria's exports in 2017 were estimated at just $1.7 billion. The government's revenues are just $1.3 billion, and public debt is 60% of GDP. Another website estimates Syria's exports at just $748 million. https://atlas.media.mit.edu/en/profile/country/syr/. Syria is not in any way a functional nation, until recently it has been barely sovereign, and it certainly does not have anything resembling the level of economic activity you mention.

You also refer to enforcement of your judgment in countries that have not honored international sanctions. While there are such countries, they are places like Somalia, Iran, North Korea, Yemen, etc., which are very unlikely to recognize, domesticate, and enforce an American FSIA judgment.

It is also not fair or accurate for you to state that "it's been six years without any action." That is simply untrue. Please recall that we attempted to enforce your judgment against the $86 million of telephone company money in Chicago. We took that matter as high as the Supreme Court, battling with two other groups of FSIA judgment creditors who held judgments against Syria. Unfortunately, we did not prevail, but not because we took no action. Similarly we attempted to enforce your judgment by executing against the Syrian top level domain name, .sy. We took that matter up to the D.C. Circuit Court of Appeals. Again, though we did not ultimately prevail, it was not for lack of trying. Indeed, we have been constantly vigilant looking for opportunities to enforce your judgment against Syria and have run down all leads we have found on Syrian assets. As I have explained to you on the telephone, it is the unfortunate reality that as long as the Syrian civil war has sidelined the Syrian economy, there just is not a lot of trade

going on with Syria. I told you that once the war ends Syria will want to rejoin the world economy and will have to deal with its judgments.

I look forward to your making the connection with the law firm that believes it has an avenue to enforce your judgment against Syria. I hope they do. Please be sure to put me in contact with them. I am available today if they want to call me.

If you respond to this email, please be sure to include both me and Nitsana.

--Bob

(Ex. A to opening papers).

6.      With all due respect to Mr. Wilson, I believe this email flatly refutes both the claim of lack of communication, and the claim that Ms. Darshan-Leitner and I have been unwilling to work on enforcing the judgment. I flatly deny Marv Wilson's claim that "Withdrawing Counsel stated they were and are unwilling to attempt collection enforcement." (Dkt. 125, p. 5). No such statement has ever been made by the undersigned or to my knowledge by Ms. Darshan-Leitner.

7.      Indeed, we have done a great deal to try to enforce this judgment, I daresay a lot more than many FSIA judgments where the judgments were obtained but no collection ever occurred before the United States Victims of State Sponsored Terrorism Fund was created.

8.      When the judgment was obtained, we embarked on a judgment enforcement effort. On December 21, 2012 we served a subpoena on the Office of Foreign Assets Control ("OFAC") seeking information about assets blocked by US sanctions programs against Syria. (Dkt. 41-1). OFAC moved for a protective order (Dkt. 41) and the Court issued a protective order providing for confidentiality of document production (Dkt. 51). We served another subpoena on OFAC on March 3, 2014 (Dkt. 57-1), followed by another motion for a protective order by OFAC (Dkt. 57) which was granted (Dkt. 58). On May 1, 2014 we registered the plaintiffs' judgment in the Southern District of New York, *Wyatt v. Syrian Arab Republic,* 14-mc-134 (SDNY). We served another subpoena on OFAC on November 25, 2015 (Dkt. 112-1),

which was followed by another motion by OFAC for a protective order (Dkt. 112), which was granted (Dkt. 113).

9.      Each of these OFAC subpoenas resulted in a production by OFAC of a list of entities which had reported to OFAC that they were in possession of assets blocked by reason of the US sanctions on Syria. These documents were produced pursuant to protective order and cannot be filed on the open docket.

10.      It must be noted that just because an asset is blocked under the Syrian sanctions programs does not mean that the assets belong to the Syrian government and are reachable by the judgment in this case. In many cases, blocked assets may belong to a Syrian company that is a separate juridical entity from the government. Also, many of the blocked transactions were very small and not worth the expenses involved in pursuing them. And very often the blocked assets are electronic fund transfers ("EFTs") which for the most part cannot be reached by judgment enforcement creditor process. *See Calderon-Cardona v. Bank of N.Y. Mellon,* 770 F.3d 993 (2d Cir. 2014); *Hausler v. JP Morgan Chase Bank, N.A.,* 770 F.3d 207 (2d Cir. 2014); *Levin v. JPMorgan Chase Bank, N.A.,* 751 F. App'x 143, 149 (2d Cir. 2018); *Doe v. JPMorgan Chase Bank, N.A.,* 899 F.3d 152 (2d Cir. 2018); *Doe v. Ejercito De Liberacion Nacional,* No. 15 CV 8652-LTS, 2017 WL 591193 (S.D.N.Y. Feb. 14, 2017), aff'd *Doe v. JPMorgan Chase Bank, N.A.,* 899 F.3d 152 (2d Cir. 2018).

11.      One of the accounts identified in the OFAC productions was an account at Abu Dhabi International Bank containing $150,036.21 that appeared to belong to Syria. We moved for condemnation and recovery of this money (Dkt. 63). Ramsey Clark, Esq. intervened claiming that the money was intended as his legal fees (Dkt. 65). The United States filed a Statement of Interest (Dkt. 105). Ultimately that motion was denied on March 18, 2015 based on a finding that

the money was protected from execution by the Vienna Convention on Diplomatic Relations (Dkt. 108).

12.     On June 24, 2014 we served a Writ of Attachment on the Internet Corporation for Assigned Names and Numbers ("ICANN") seeking to enforce the plaintiffs' judgment against Syria's top level internet domain name (Dkt. 64). This was a creative, outside-the-box, never-before-been-done idea. This Court ultimately dismissed the writ (Dkt. 98), and we appealed to the D.C. Circuit, which affirmed the dismissal *sub nom. Weinstein v. Islamic Republic of Iran,* 831 F.3d 470 (2016). This was not some small thing, though. Had we prevailed the value of the Syrian top level domain name would likely have satisfied the judgment in full.

13.     On August 11, 2014 we filed an action in the Northern District of Illinois, *Wyatt v. Syrian Arab Republic*, N.D. Ill. 14-cv-6161, seeking to assert priority over $80 million of Syrian assets that other creditors of Syria, the plaintiffs in *Gates v. Syrian Arab Republic,* 580 F. Supp. 2d 53 (D.D.C. 2008) and *Baker v. Socialist People's Libyan Arab Jamahirya,* 775 F. Supp. 2d 48 (D.D.C. 2011)*,* had previously moved against. The *Gates* and *Baker* plaintiffs had already fought out their priorities, with *Gates* prevailing. *Gates v. Syrian Arab Republic*, 755 F.3d 568 (7th Cir. 2014). After the case was remanded from the Seventh Circuit, we appeared in the district court to assert that the plaintiffs herein had priority over the *Gates* plaintiffs. Our arguments were denied in the district court, *Gates v. Syrian Arab Republic*, 2014 WL 5422983 (N.D. Ill. 2014). We appealed to the Seventh Circuit, *Wyatt v. Syrian Arab Republic,* 800 F.3d 331 (7th Cir. 2015), but the order was affirmed. We petitioned for certiorari to the US Supreme Court, but that was denied, *Wyatt v. Gates*, 136 S. Ct. 1721 (2016).

14.     On February 29, 2016, using the information we obtained from OFAC, we obtained a Writ of Execution in *Wyatt v. Syrian Arab Republic,* 14-mc-134 (SDNY), and we had the United States Marshal levy the execution on 14 entities that were identified in the documents

received from OFAC. Each of those levies of the executions resulted in no recovery. (14-mc-134 (SDNY) docket entries 8-21).

15.     In March 2016 we also served subpoenas on 10 entities identified in the OFAC documents seeking information about the assets that had been reported to OFAC. Most of these subpoenas were complied with. No assets of the Syrian government that could be reached with the plaintiffs' judgment were revealed.

16.     By mid-2016 we had exhausted all known avenues of judgment enforcement in this case. We are certainly willing to run down any lead, and pursue any asset. But one cannot extract water from rocks. If there are no known assets at this time, that is just reality and we need to be patient.

17.     Meanwhile, in December 2015 Congress enacted the Justice for Victims of State Sponsored Terror Act, 34 U.S.C. § 20144, which created a fund to partially satisfy FSIA judgments against state sponsors of terrorism. Once the regulations governing that fund were promulgated in July 2016, we made sure to complete the necessary paperwork for the plaintiffs to submit applications to that fund, and in fact the plaintiffs have recovered substantial money from the Fund, and are poised to receive more.

18.     All of the above enforcement activity was conducted with full knowledge of the plaintiffs, particularly Marv Wilson.

19.     Marv Wilson also claims that he has allegedly requested a report of expenses incurred in the prosecution of this lawsuit and that we have refused to provide it. That claim is false. Until the plaintiffs sent their termination letter, there had never been a request for a report of expenses from Mr. Wilson or any other plaintiff except in October 2014, at the time we were negotiating the retainer agreement that was ultimately signed in 2015.

20.     An email thread from October 2014 documents the history. Mr. Wilson asked for a list of expenses (Ex. P, email Oct. 19, 2014, 2:26 PM). I asked him how precisely he needed the expenses, and explained why providing them is a "real chore." I asked Mr. Wilson whether it would be sufficient to just state that the expenses "are no more than X." (Ex. P, email Oct. 19, 2014, 1:33 PM) (the time sequence seems to be anomalous, perhaps because Mr. Wilson and I were in different time zones). Mr. Wilson responded "Yes, that will give us a view of the gross expenses. Thanks." (Ex. P, email Oct. 20, 2014, 12:10 PM). A few minutes later I responded that the expenses of the case were between $50,000 - $60,000 and asked "Do you need more detail than that?" (Ex. P, email Oct. 20, 2014, 12:19 PM). Mr. Wilson responded "That will work fine. Thanks." (Ex. P, email Oct. 20, 2014, 3:13 PM). That was the last discussion of expenses between me and Marv Wilson until the termination letter of July 12, 2019.

21.     Regarding the issue of Mr. Strachman's fees, that was a specific issue addressed during the negotiation of the 2015 retainer agreement with the plaintiffs. It was part of the 2015 agreement that Mr. Strachman's fees would be paid by Ms. Darshan-Leitner and me. At no time did any of the plaintiffs indicate that they believed the 2001 retainer agreement with Mr. Strachman was invalid or unenforceable. On the contrary, the provision of the 2015 retainer by which we assumed responsibility for Mr. Strachman's fees confirms that everyone understood that there was an issue of Mr. Strachman being owed fees under the 2001 retainer.

Dated: Brooklyn, New York
      September 19, 2019

                                /s/ Robert J. Tolchin
                              Robert J. Tolchin