# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

-----------------------------------------------------------------------X

MARY NELL WYATT, *et al.*,

                Plaintiffs,              Docket No: 08-cv-502 (RCL)

        -against-

SYRIAN ARAB REPUBLIC, *et al.*,

                Defendants.

-----------------------------------------------------------------------X

## REPLY IN FURTHER SUPPORT OF MOTION BY PLAINTIFFS' COUNSEL TO WITHDRAW, TO DECLARE THEIR RIGHTS TO LEGAL FEES, AND FOR RELATED RELIEF

The Court of Appeals for the District of Columbia Circuit introduced its opinion concerning a legal fee dispute with the sagacious comment: "Like a contentious corporate merger or a sizable family inheritance, a large contingency fee in a successful lawsuit sometimes leads to nasty controversy over who gets what. This case is a fine example." *Perles v. Kagy*, 473 F.3d 1244, 1246 (D.C. Cir. 2007). Truer words have never been spoken.

The plaintiffs here agree they retained counsel in 2001 on a one-third contingency fee basis. They agree they retained successor counsel in 2012, confirmed in emails (Ex. C and D to the opening motion). They split hairs and pettifog about whether they retained David Strachman alone in 2001, or whether Israeli attorney Nitsana Darshan-Leitner was involved from the beginning or only sometime later and in what capacity.[1] But they do not and cannot deny that as

---

[1] Plaintiffs deepen their obfuscations by also mischaracterizing the identity of the parties to this fee dispute by referring repeatedly to "Shurat HaDin" (an Israeli NGO which did not even exist in 2001). *See* Dkt. 125 at 1-2, 4-5. But as is crystal-clear from our opening motion papers

*(continued next page)*

a result of the continuum of effort of these attorneys—Strachman, Darshan-Leitner, and Tolchin—working on their case, whether alone, together, or in some combination, for the past 18 years they successfully obtained a judgment, collected a substantial recovery, and are likely to collect substantially more in the future from the USVSST Fund and potentially from other collection efforts.

The plaintiffs' focus has now shifted. They once focused on obtaining justice against those who supported the 1991 kidnapping of plaintiffs Marvin Wilson and the late Ronald Wyatt. Then they focused on realistic efforts to enforce that judgment, and later on submitting applications and the required documentation to the USVSST Fund to obtain partial payments of their judgment. Now, with the judgment in hand, it appearing that there are presently no Syrian assets that can be levied upon with their judgment, and with the USVSST Fund claim safely approved and the payments from the Fund scheduled to be paid automatically going forward for the entire life of the Fund, the focus has become finding a way to avoid paying the attorneys who assisted them all these years so they can keep the agreed-upon legal fee portion of the recovery for themselves.[2]

---

Shurat HaDin is not a party to this fee dispute and was neither retained by nor counsel for plaintiffs. Shurat HaDin is not a law firm. The relevant issue is Ms. Darshan-Leitner's involvement, not Shurat HaDin's.

[2] Over 5,000 plaintiffs holding judgments against state-sponsors of terrorism have submitted applications to the USVSST Fund. *See* usvsst.com/docs/Congressional_Report.pdf. Any decision by this Court endorsing the instant plaintiffs' argument that they are entitled to dismiss their counsel and thereby avoid paying attorney's fees on future distributions from the USVSST Fund, will inevitably be interpreted by some of the 5,000 other Fund recipients as *carte blanche* to fire their attorneys to evade paying attorney's fees on future distributions. Such a ruling would both be unfair to the FSIA plaintiffs' bar, and generate of flood of fee dispute litigation.

To serve their new focus, the plaintiffs have sought to re-write history. Now Marv Wilson seeks to paint the undersigned in a bad light. Yet on May 26, 2015—six months before the USVSST Fund was even a glimmer in Marv Wilson's eye—his opinion was quite different, as he wrote in an email the week after oral argument in the Seventh Circuit of the collection case in Chicago:

> Bob,
>
> Just a note to say thank you, I believe you did an outstanding job at the Appeals Court in Oral Arguments. Also, thank you for representing us in a very professional and knowledgeable manner.
>
> Marv Wilson

(Ex. H). That email was copied to Ms. Darshan-Leitner. Marv Wilson's positive attitude towards the undersigned was shared by his son Marty Wilson (who unfortunately passed away this year). After the first USVSST Fund payments were received, the undersigned assisted Marty Wilson to negotiate a reduction of interest due on a loan against his judgment in this action he had taken out from Relief Funding, a law suit lender. On May 17, 2017 Marty wrote to the undersigned:

> Afternoon Robert,
>
> I just wanted to thank you for all of your help in getting my Relief Funding payment reduced. Bob, I would be happy to pay you for your time. I also want you to know that I have learned that some of my siblings have not been quite as patient with you as they should have been. Just know that this has been a long time coming, and hopefully more to come, and I, personally, have enjoyed working with you! Maybe because I am a business owner and familiar with time delays when it comes to monetary transactions... Shabbat Shalom, and have a good Sabbath and weekend!
>
> Yah bless,
>
> Marty Wilson

(Ex. I). Marv and Renetta Wilson also visited Israel and participated in an educational mission organized by Ms. Darshan-Leitner in January 2017. After that visit, they emailed Ms. Darshan-

Leitner's husband saying: "Renetta and I thank you and Nitsana for taking the time to meet with *[sic]*. We both enjoyed the time and interaction and look forward to future visits." (Ex. J). Plainly Marv and Renetta were not expressing displeasure of any sort. The Wilsons were not alone in expressing thanks and positive feeling. Mary Nell Lee (widow of Ronald Wyatt) sent a paralegal in my office an email on February 14, 2017 discussing the distribution of the USVSST payment and concluding "Thank you very much for all your hard work on our behalf. We are all very grateful. Blessings." (Ex. K). Back in 2012, plaintiff Mary Nell (Wyatt) Lee sent an email to Ms. Darshan-Leitner and her husband Avi saying "We are confident that you are doing everything possible to follow up on our judgment. I just wanted to thank you so very much for not giving up on our case. We are all very, very grateful for you hard work." (Ex. L). Similar notes of thanks were received from several other of the plaintiffs. Nobody ever articulated any problem with the service being provided.

Plaintiffs' new focus has also brought them to re-write history about the involvement of Ms. Darshan-Leitner in the case. Now they pretend they did not know anything about her involvement until 2012.[3] This claim is easily refuted: the retainer agreement signed by Mr. Wilson and the other plaintiffs in 2015 expressly confirms that Ms. Darshan-Leitner's representation of them began many years before 2012. *See* opening motion papers, Dkt. 122 at Ex. E, p. 1.[4]

---

[3] Additionally, as discussed in footnote 1, plaintiffs seek to mis-frame the discussion to focus on the irrelevant, red herring "issue" of whether Shurat HaDin was involved.

[4] As explained in our opening motion, the retainer agreement references 2008 simply because that was when the case under the then newly-enacted FSIA § 1605A was filed, but in fact Ms. Darshan-Leitner and her team were fully involved from day one in this matter, *i.e.* from

*(continued next page)*

Marv Wilson also forgets that on September 22, 2010, he and his wife Renetta Wilson sent a very complimentary email to Mr. Strachman:

> Greetings David,
>
> Thank you for the timely copy of the court decision.
>
> We want to express our appreciation for your continuing excellent filings and all the effort you have expended on this law suit. It seems to us it has taken an exorbitant amount of preparation and patience to follow through with all the defensive maneuverings and appeals but in every case we have prevailed. This speaks greatly of your professional knowledge and ability to wade through all the legal entanglements and keep this suit going forward.
>
> Thanks again for your efforts. Let us know if there is anything we need to do.
>
> Marv & Renetta Wilson

(Ex. M). Mr. Strachman's immediate response was:

> Marv,
>
> Thanks for the kind words, *as I mentioned today in our call, this case is a team effort, primarily lead by Israeli counsel* Mordechai Hal[l]er, Nitsana Darshan Leitner and Avi Leitner and I am forwarding your email to them.
>
> Regards to your wife and family.
>
> Dave

(Ex. M) (emphasis added). That was two and a half years before Mr. Strachman withdrew from the case. Avi Leitner is Nitsana Darshan-Leitner's husband. Mordechai Haller is an Israeli attorney who has worked on terrorism cases with Ms. Darshan-Leitner for many years. Plainly, Marv Wilson's claim that he did not know about the involvement of Ms. Darshan-Leitner's team until 2012 is false.

---

2001, when the initial FSIA § 1605(a)(7) action (the competent handling of which for seven years enabled the § 1605A to be filed) was brought.

Conspicuously, only Marv Wilson has submitted a declaration. Nobody from the Wyatt family has done so.[5] Presumably, that is because they cannot truthfully support Mr. Wilson's baseless claim. For example, plaintiff Mary Nell (Wyatt) Lee emailed Mr. Strachman in 2006 saying she would be visiting Israel and wanted to meet him (even though Mr. Strachman lives and works in Rhode Island) (Ex. N, May 12, 2016, 1:13 AM). Mr. Strachman responded "I probably won't be in Israel at that time *but my partners* will be and would like to meet with you." (Ex. N, May 12, 2006, 9:48 AM) (emphasis added). Following up on this exchange, on June 4, 2006, Ms. Darshan-Leitner emailed Mary Nell Lee identifying herself as follows: "I am one of your Israeli based attorneys working on the case against Syria." (Ex. O, June 4, 2006 12:47 AM) The subject of that email was "attorney in Israel." Ms. Lee set up a meeting with Ms. Darshan-Leitner in Jerusalem (Ex. O) and when she was in Israel Ms. Lee met with Ms. Darshan-Leitner and her husband, as stated in the accompanying declaration of Nitsana Darshan-Leitner

Clearly, then, the plaintiffs cannot honestly deny knowing all along that Ms. Darshan-Leitner's team were Mr. Strachman's "partners" on her case.

Indeed, as Mr. Strachman and Ms. Darshan-Leitner confirm in their accompanying declarations—and as reflected in the contemporaneous communications attached as exhibits

---

[5] Marv Wilson's declaration is inadmissible regarding any matter outside his personal knowledge. Thus, his declaration cannot even purport to establish when any other plaintiff knew of Ms. Darshan-Leitner's involvement (or any other fact necessarily within the personal knowledge of any other plaintiff). Mr. Wilson speaks only for himself, and the Court should summarily disregard any purported factual statement contained in his declaration which is not within his personal knowledge. Similarly, the Court should disregard as unsupported any putative factual averment contained in plaintiffs' opposition memorandum, which is signed only by plaintiffs' new counsel and is thus unsupported by admissible declaration testimony or documentary evidence.

thereto—the plaintiffs were fully aware of the Darshan-Leitner team's role in this case from the start. *See* Decl. of David J. Strachman at ¶¶ 3-11; Decl. of Nitsana Darshan-Leitner at ¶¶ 3, 7, 8, 12-14.

The facts are thus clear and plaintiffs' claims to the contrary are unsupportable and, indeed, unsupported. Actually, they are simply pretexts. No avenues presently exist to enforce the judgment against Syria, so the plaintiffs have come to the conclusion that the only way to increase their recovery is to shortchange their loyal attorneys. When we were working for their benefit, they were full of thanks and compliments. Now that their benefit has been received—and will continue to be received, automatically, from the USVSST Fund for many years to come—they have apparently deemed their long-time counsel dispensable and are seeking to keep the legal fees for themselves. Their arguments should be seen for what they are.

**A.     Plaintiffs Have Pointed to No Enforcement Opportunities**

Plaintiffs have fabricated an argument that they terminated the undersigned and Ms. Darshan-Leitner for cause, thereby vitiating our entitlement to be paid on the terms long-agreed to. The "cause" they invoke is that the undersigned and Ms. Darshan-Leitner have allegedly refused to pursue collection of the judgment for several years. They blame counsel for the unfortunate empirical fact that, at this time, there do not seem to be any Syrian assets available that can be reached with their judgment. That is the unfortunate reality. It does not reflect negatively on Withdrawing Counsel, much less constitute grounds for dismissal for "cause."

In the first place, the accompanying Declaration of Robert J. Tolchin, Esq., details the judgment enforcement efforts that we made on behalf of the plaintiffs over the years. As the Court can see, numerous avenues were pursued.

Moreover, Withdrawing Counsel never "refused" to enforce the judgment. *See id.,* at ¶¶ 5-16. Withdrawing Counsel did inform the plaintiffs that at present we were not aware of any viable judgment enforcement avenues, and that this situation was unlikely to change until after the Syrian Civil War winds down and Syria starts doing business with the world again. *Id.*, ¶ 5.This was plainly laid out in an email sent by the undersigned to Marv Wilson in response to an inquiry from him on December 21, 2018 which was attached as Ex. A to the opening motion papers. Informing the plaintiffs about the objective absence of judgment enforcement opportunities does not, by any stretch of the imagination, constitute a "refusal" to enforce the judgment.

On the contrary, Withdrawing Counsel would have been extremely pleased to have learned of some means of enforcing the judgment, and would have pursued it with the same vigor as we tackled the avenues which were tried but did not succeed. But the plaintiffs, despite their current complaints against counsel, never informed us or pointed to any such means.

Notably, even now, plaintiffs' opposition papers do not state that there were or are any specific judgment enforcement opportunities we should have pursued or that can presently be pursued. They just baldly assert that nothing is being done, without affirmatively stating that there is anything that could have been done or that can be done at this time. The plaintiffs and their new counsel have not pointed to a single Syrian asset that Withdrawing Counsel supposedly failed to pursue. If they were aware of one, they should have told us about it and we would have pursued it for them. At a minimum, they should have identified it in their opposition papers. The plaintiffs have apparently been represented by their new counsel since sometime before their July 12, 2019 termination letter (which was obviously ghostwritten by an attorney), yet they have not commenced any judgment enforcement proceedings, which means they demonstrate with

their conduct that they agree there are no viable judgment enforcement opportunities available. If they were actually aware of any judgment enforcement opportunities, would they do nothing and risk other judgment creditors of Syria liening up those assets first?

Plaintiffs dissemble outrightly when they assert that "Withdrawing Counsel stated they were and are unwilling to attempt collection enforcement." (Dkt. 125, p. 5). No such statement has ever been made by the undersigned or Ms. Darshan-Leitner. *See* Tolchin Decl. at ¶ 6; Darshan-Leitner Decl. at ¶ 15. If there were a Syrian asset somewhere that could be reached with the judgment of this court and the powers of judgment enforcement available, of course we would pursue it. Withdrawing Counsel stands and has always stood ready to handle any collection actions in keeping with the terms of our retention.[6]

**B.     The Issue of When Ms. Darshan-Leitner Became Involved Is a Red Herring**

Plaintiffs devote much of their opposition papers to discussing their contention that either Ms. Darshan-Leitner was not involved in their case before 2012, or alternatively that they did not know of her involvement. They ask the Court to disregard Mr. Strachman's statements in his 2012 motion to withdraw (Dkt. 24, p. 7 & p.7 n.2), quoted in our opening motion papers (and backed up by the Declaration from Mr. Strachman attached hereto and contemporaneous written communications), that Ms. Darshan-Leitner was involved from the inception, and to disregard that Mr. Strachman's motion was served on each of the plaintiffs by Mr. Strachman on March 30, 2012 (Dkt. 24, pp. 8-9) and that none of the plaintiffs objected or said "hey, that ain't so." However, this issue does not need to be resolved as it does not matter. Regardless of what the

---

[6] If plaintiffs are arguing that Withdrawing Counsel had a duty to execute against Syrian assets outside of the United States, that argument is defeated by the 2015 retainer agreement, which expressly provided for retention of separate and additional counsel for such purpose. (Ex. E, at p. 1-2).

state of affairs was from 2001-2012, it is undisputed that on July 1, 2012 the Wyatts and the Wilsons agreed to retain Ms. Darshan-Leitner and the undersigned (Ex. C, D to opening motion papers), the representation was begun, an enormous amount of work was done, and a formal retainer agreement was ultimately signed by each of the plaintiffs in 2015 (Ex. E to opening motion papers).

The 2015 retainer agreement, formalizing the last-minute and urgent retention made by email on July 1, 2012 when there was a court date scheduled for July 2, is a valid and enforceable agreement. It scarcely matters which lawyers were retained before. This issue is thus a red herring and should be disregarded.

Plaintiffs' argument about whether the language of Mr. Strachman's retainer adequately disclosed Ms. Darshan-Leitner's involvement (of which plaintiffs were fully aware) is precluded. When the 2015 retainer was negotiated, it included a provision stating that the undersigned and Ms. Darshan-Leitner would assume responsibility for the fees and expenses owed to Mr. Strachman under the 2001 retainer, which otherwise would have been owed by the plaintiffs. *Id*. at p. 2.

Pursuant to this provision, Withdrawing Counsel later reached an agreement with Mr. Strachman, under which they assumed full responsibility for his fees and expenses—and thereby relieved the plaintiffs of any of their obligations to Mr. Strachman under the 2001 agreement. *See* Strachman Decl. at ¶ 12.

Having signed the 2015 retainer agreement containing a provision by which Withdrawing Counsel assumed plaintiffs' obligations to Mr. Strachman under the 2001 agreement—without ever challenging the validity or effect of that 2001 agreement—the plaintiffs cannot now be heard to do so. Indeed, by bargaining for and agreeing that Withdrawing Counsel would assume

plaintiffs' obligations to Mr. Strachman under the 2001 retainer, plaintiffs clearly recognized the validity and effect of that retainer.

In any case, plaintiffs' argument about whether Mr. Strachman's retainer adequately disclosed Ms. Darshan-Leitner's involvement is ultimately also a red herring. Mr. Strachman's 2001 retainer is not the operative retainer anymore. The 2015 retainer (Ex. E to opening motion papers) is. That retainer, as well as the 2012 retainer emails (Ex. C, D to opening motion papers) are certainly adequate in this regard.

It should be noted that the case cited by plaintiffs on this point, *Shtauber v. Gerson*, 239 F. Supp. 3d 248 (D.D.C. 2017), actually undermines the plaintiffs' position. In *Shtauber*, a lawyer signed a contract with a non-lawyer consultant to assist with an Anti-Terrorism Act case against Arab Bank. That contract contained a contingency fee provision. When the consultant moved to enforce the agreement, the lawyer invoked the D.C. Rules of Professional Conduct that prohibit an attorney from splitting a fee with a non-lawyer consultant. The Court considered whether a contract that was not permitted by the D.C. Rules of Professional Conduct could nevertheless be enforced by the non-lawyer consultant. Judge Bates held the agreement enforceable.[7] He also quoted a decision from the New York Court of Appeals that is directly applicable to our case: "it ill becomes defendants…to seek to avoid on 'ethical' grounds the

---

[7] Plaintiffs also cite a Virginia case, *Moskowitz v. Jacobson Holman, PLLC,* No. 1:15-cv-336, 2016 WL 356035 (E.D. Va. Jan. 28, 2016) for the purported proposition that "contracts that violate D.C. Rules are unenforceable as a matter of law." (Op., p. 11). But they overstate what *Moskowitz* held. The *Moskowtiz* court's holding was limited to whether a law firm partnership agreement that restricts a lawyer's right to practice upon leaving the firm violates D.C. Rule of Professional Conduct 5.6, and did not discuss any other rule or make a general pronouncement about all rules. Moreover, the *Shtauber* case, which is from this district, and is a later case, held that a contract violating a D.C. Rule of Professional Conduct could be enforced.

obligations of an agreement to which they freely assented and from which they reaped the benefits." *Id,* 239 F. Supp. 3d at 254, quoting *Benjamin v. Koeppel*, 85 N.Y.2d 549 (N.Y. 1995) (holding fee sharing arrangement between attorneys enforceable, even though one attorney failed to register with the state as required). Just like the defendants in *Shtauber*, it ill becomes the plaintiffs in our case to seek to avoid on so-called ethical grounds the obligations of an agreement to which they freely assented and from which they reaped very substantial benefits— and on the basis of facts of which they were fully aware all along.

**C.     Holding the Plaintiffs to Their Retainer Agreement Is Perfectly Fair**

The 2015 retainer agreement is an unremarkable, fairly ordinary contingency fee retainer agreement, providing for a legal fee of one-third of any recovery, with no fee due if there is no recovery. Mr. Strachman's retainer agreement also provided for a one-third contingency fee with no fee due unless successful. Thus the basic arrangement between the plaintiffs and their counsel has always been the same.

Plaintiffs point out that Mr. Strachman was counsel between 2001–2012, and that the undersigned (as distinct from Ms. Darshan-Leitner) naturally did not do any of the work that took place during that period. Leaving aside that the laboring oar on much of the work done during that period was rowed by Ms. Darshan-Leitner and attorneys in Israel affiliated with her office—as is confirmed by Mr. Strachman in his declaration submitted herewith, the exhibits attached thereto, and his 2012 motion to withdraw (Dkt. 24, p. 7, n.2) quoted on pp. 12-13 of the opening motion papers—the fact remains that the plaintiffs received the benefit of the work done during that period, whether by Mr. Strachman or someone else working with him, and the plaintiffs did not pay Mr. Strachman a farthing for that work. Rather, plaintiffs contracted with the undersigned and Ms. Darshan-Leitner to continue essentially the same one-third contingency

fee arrangement,[8] and the undersigned and Ms. Darshan-Leitner agreed to assume the obligation to pay Mr. Strachman whatever he was owed. In fact, the undersigned has already paid Mr. Strachman's fees from the recovery to date.

Since the undersigned and Ms. Darshan-Leitner agreed to assume the obligation to pay Mr. Strachman's fees and expenses and to hold the plaintiffs harmless from any obligation to Mr. Strachman, and since they agreed to continue and finish everything Mr. Strachman had started, the undersigned and Ms. Darshan-Leitner should effectively be viewed as having assumed Mr. Strachman's rights and obligations.

Thus, the 2015 retainer agreement is perfectly fair to the plaintiffs. It preserved the benefit to them of a one-third contingency fee retention. It added nothing to the plaintiffs' costs. It paid all the lawyers who worked on plaintiffs' case. And it enabled the plaintiffs to have their case completed and brought to judgment at no additional cost to them. In short, it advantaged the plaintiffs in every way, and prejudiced them in none.

Holding the plaintiffs to the terms of this retainer agreement is perfectly fair to everyone. Deviating from it at this point is unfair and prejudicial to the attorneys, and would be an undeserved windfall to the plaintiffs.

**D.      Having Obtained the Judgment, Counsel Is Entitled to Receive Their Contingency Fees in Perpetuity**

The contingency fee retainer agreement at issue here (Ex. E to opening papers) is a valid and enforceable agreement, and plaintiffs do not contend otherwise. The document is clear, complete, and unambiguous, and thus must be enforced according to its terms.

---

[8] An allowance for specialty counsel of up to 10% was added.

The first paragraph of the agreement provides that the undersigned and Ms. Darshan-Leitner were retained "to prosecute or adjust a claim for damages" and grants the attorneys "the exclusive right to take all legal steps to enforce this claim against all parties." (Ex. E to opening papers, p.1, first paragraph). In consideration of taking on this responsibility, the plaintiffs "agrees to pay Attorney, assigns to Attorney, and authorizes the Attorneys to retain out of any moneys that may come into Attorney's hand by reason of the above claim, including by any claims tribunal or government compensation, a fee of one-third (33.33%) of the sum recovered," subject to a clause providing that "in the event any law or regulation mandates a lower Fee, the provisions of such law or regulation" control. (*Id.,* third paragraph). Finally, it provided that "any fees to which Clients' former counsel, David Strachman, Esq., or his firm, may be entitled shall be paid by the Attorney out of the Fee, and in no way shall reduce the recovery of the client." *(Id.,*, p. 2, first full paragraph).

This agreement clearly and unambiguously provides for a contingency fee retention. It is therefore incomprehensible why plaintiffs' opposition papers on page 10 cite *Ginberg v. Tauber*, 678 A.2d 543 (D.C. 1996) for the proposition that courts "should be wary of awarding a result-based fee unless the attorney seeking such a fee has obtained the client's agreement to that arrangement at the beginning of the representation." *Id.,* 678 A.2d at 552 (D.C. 1996). Unlike the attorney in *Ginberg* who had no fee agreement with his client, in this case there are plainly a series of fee agreements, all of which provide for a one-third contingency.

The undersigned and Ms. Darshan-Leitner have done everything they were obligated to do under this agreement. The case was brought to a conclusion with a final judgment obtained. The defendant's appeal was successfully defended. Three enforcement proceedings were commenced (two before this Court, and one in the Northern District of Illinois), and two of those

were vigorously pursued, albeit without success, on appeal. Applications to the USVSST Fund were successfully submitted. Plaintiffs have already received two substantial payments from the Fund as a result of the undersigned and Ms. Darshan-Leitner following through on their commitments. Further, the undersigned and Ms. Darshan-Leitner stand and have always stood ready to commence and litigate to finality any viable judgment enforcement proceeding, and would do so immediately if we would become aware of such an opportunity.

Having done precisely what we contracted to do, and having shepherded the case to the point where the plaintiffs are recovering substantial money, and will continue to recover substantial money on the basis of the judgment we obtained for them, per the retainer agreement we are entitled to our agreed-upon fees. Our entitlement to fees for work already done continues in perpetuity.

This position is supported by the case cited by plaintiffs on page 7 of their opposition papers, *Kaushiva v. Hutter,* 454 A.2d 1373 (D.C. 1983). There, the District of Columbia Court of Appeals held, in language directly applicable to our case, "where an attorney is discharged without cause and the client subsequently recovers, the attorney is entitled to the full amount of his fee. *Id.,* 454 A.2d at 1375. The Court explained:

> There is ample evidence in the Record to show that there was a contingent fee arrangement. A copy of the Agreement was presented at trial. The court specifically found that there had been a mutual exchange of promises and consideration such as would support a contract. Moreover, appellee showed that he had substantially performed under the Agreement. He did, in fact, represent appellant at the arbitration hearings in September and November of 1979, a fact which appellant does not deny. There was also evidence that appellee was at all times ready, willing, and able to continue his representation of appellant. Finally, the Record shows that appellant prevented appellee from completing his performance by discharging him without cause. Appellant's telephone call to appellee on November 9, 1979, together with appellee's confirming letter of November 12, 1979, provided adequate evidence that Kaushiva terminated

> Hutter's services prior to the completion of the work necessary to obtain final action in Kaushiva's favor. Thus, the evidence below is sufficient to sustain the court's judgment as to appellee's entitlement to his fee.

*Id. See also*, *Greenberg v. Sher*, 567 A.2d 882 (D.C. 1989) (following *Kaushiva*, and awarding contingency fee to discharged counsel after new counsel took over the case and settled it after four hours' work and sought to deprive former counsel of his fee). "The compensation due an attorney who has been discharged without cause is the 'recovery of the full contingency fee . . . . [where] the attorney has, before discharge, fully performed, substantially performed, or contributed substantially to the results finally obtained by the client.'" *Carolina v. Potomac Elec. Power*, 1992 U.S. Dist. LEXIS 22614, *12, quoting *In re Waller*, 524 A.2d 748, 750 (D.C. 1987).

With respect to the USVSST Fund, nothing further remains to be done so we are certainly entitled to our full fee as long as the Fund is in existence (this is year 3 of a 10 year term, which may be extended by Congress).

If other lawyers bring judgment enforcement proceedings and successfully recover money, we are still entitled to fees. However, in that eventuality, depending on the circumstances, enforcing counsel might be entitled to up to an additional 10% in fees, as provided in the 2015 retainer. However, since there is no such enforcement proceeding at this time, nor one on the horizon, it is presently speculative and premature to determine any fee division regarding enforcement litigation.

### E.     Erik Syverson Is No Longer Involved in This Case

On page 2 of plaintiffs' opposition papers they mention terminating Erik Syverson, Esq. as counsel. Mr. Syverson's involvement in the case was limited to the supplemental proceeding to enforce the judgment against ICAAN. His involvement ended when the D.C. Circuit affirmed

the dismissal of that supplemental proceeding. He has this had no continuing connection to this matter for several years now.

### F.  Modified Proposed Order

Submitted herewith is a modified proposed order. The main modification is to reflect that since the motion was made the parties worked out a stipulation regarding treatment of future payments from the USVSST Fund. Pursuant to that stipulation, the USVSST Fund will be instructed to make to the Attorney Trust Account of plaintiffs' new counsel, who will hold 25% of the moneys received in escrow pending final determination of this dispute.

The modified proposed order also corrects an omission from the original, which referred only to The Berkman Law Office as outgoing counsel for the plaintiffs, whereas the modified proposed order adds Nitsana Darshan-Leitner.

Dated:   Brooklyn, New York
         September 19, 2019

                                              Respectfully submitted,

                                              THE BERKMAN LAW OFFICE, LLC
                                              *Outgoing Attorneys for the Plaintiffs*

                                   by:  _____
                                               Robert J. Tolchin

                                              111 Livingston Street, Suite 1928
                                              Brooklyn, New York 11201
                                              718-855-3627

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the date indicated below a true copy of the foregoing was served via ECF on all counsel of record herein.

Dated:   Brooklyn, New York
         September 19, 2019

_____
Robert J. Tolchin